# CRAWFORD *v.* WASHINGTON

No. 02–9410. Argued November 10, 2003—Decided March 8, 2004

*Jeffrey L. Fisher,* by appointment of the Court, 540 U. S. 807, argued the cause for petitioner. With him on the briefs was *Bruce E. H. Johnson.*

*Steven C. Sherman* argued the cause for respondent. With him on the brief was *John Michael Jones.*

*Deputy Solicitor General Dreeben* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Olson, Acting*

*Assistant Attorney General Wray, Sri Srinivasan,* and *Joel M. Gershowitz.* *

JUSTICE SCALIA delivered the opinion of the Court.

Petitioner Michael Crawford stabbed a man who allegedly tried to rape his wife, Sylvia. At his trial, the State played for the jury Sylvia's tape-recorded statement to the police describing the stabbing, even though he had no opportunity for cross-examination. The Washington Supreme Court upheld petitioner's conviction after determining that Sylvia's statement was reliable. The question presented is whether this procedure complied with the Sixth Amendment's guarantee that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

I

On August 5, 1999, Kenneth Lee was stabbed at his apartment. Police arrested petitioner later that night. After giving petitioner and his wife *Miranda* warnings, detectives interrogated each of them twice. Petitioner eventually confessed that he and Sylvia had gone in search of Lee because he was upset over an earlier incident in which Lee had tried to rape her. The two had found Lee at his apartment, and a fight ensued in which Lee was stabbed in the torso and petitioner's hand was cut.

Petitioner gave the following account of the fight:

"Q. Okay. Did you ever see anything in [Lee's] hands?

"A. I think so, but I'm not positive.

"Q. Okay, when you think so, what do you mean by that?

"A. I could a swore I seen him goin' for somethin' before, right before everything happened. He was like

---

*Briefs of *amici curiae* urging reversal were filed for the National Association of Criminal Defense Lawyers et al. by *Jeffrey T. Green, David M. Porter,* and *Steven R. Shapiro;* and for Sherman J. Clark et al. by *Richard D. Friedman* and *David A. Moran.*

reachin', fiddlin' around down here and stuff . . . and I just . . . I don't know, I think, this is just a possibility, but I think, I think that he pulled somethin' out and I grabbed for it and that's how I got cut . . . but I'm not positive. I, I, my mind goes blank when things like this happen. I mean, I just, I remember things wrong, I remember things that just doesn't, don't make sense to me later." App. 155 (punctuation added).

Sylvia generally corroborated petitioner's story about the events leading up to the fight, but her account of the fight itself was arguably different—particularly with respect to whether Lee had drawn a weapon before petitioner assaulted him:

"Q. Did Kenny do anything to fight back from this assault?

"A. (pausing) I know he reached into his pocket . . . or somethin' . . . I don't know what.

"Q. After he was stabbed?

"A. He saw Michael coming up. He lifted his hand . . . his chest open, he might [have] went to go strike his hand out or something and then (inaudible).

"Q. Okay, you, you gotta speak up.

"A. Okay, he lifted his hand over his head maybe to strike Michael's hand down or something and then he put his hands in his . . . put his right hand in his right pocket . . . took a step back . . . Michael proceeded to stab him . . . then his hands were like . . . how do you explain this . . . open arms . . . with his hands open and he fell down . . . and we ran (describing subject holding hands open, palms toward assailant).

"Q. Okay, when he's standing there with his open hands, you're talking about Kenny, correct?

"A. Yeah, after, after the fact, yes.

"Q. Did you see anything in his hands at that point?

"A. (pausing) um um (no)." *Id.*, at 137 (punctuation added).

The State charged petitioner with assault and attempted murder. At trial, he claimed self-defense. Sylvia did not testify because of the state marital privilege, which generally bars a spouse from testifying without the other spouse's consent. See Wash. Rev. Code § 5.60.060(1) (1994). In Washington, this privilege does not extend to a spouse's out-of-court statements admissible under a hearsay exception, see *State* v. *Burden*, 120 Wash. 2d 371, 377, 841 P. 2d 758, 761 (1992), so the State sought to introduce Sylvia's tape-recorded statements to the police as evidence that the stabbing was not in self-defense. Noting that Sylvia had admitted she led petitioner to Lee's apartment and thus had facilitated the assault, the State invoked the hearsay exception for statements against penal interest, Wash. Rule Evid. 804(b)(3) (2003).

Petitioner countered that, state law notwithstanding, admitting the evidence would violate his federal constitutional right to be "confronted with the witnesses against him." Amdt. 6. According to our description of that right in *Ohio* v. *Roberts*, 448 U. S. 56 (1980), it does not bar admission of an unavailable witness's statement against a criminal defendant if the statement bears "adequate 'indicia of reliability.'" *Id.*, at 66. To meet that test, evidence must either fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." *Ibid.* The trial court here admitted the statement on the latter ground, offering several reasons why it was trustworthy: Sylvia was not shifting blame but rather corroborating her husband's story that he acted in self-defense or "justified reprisal"; she had direct knowledge as an eyewitness; she was describing recent events; and she was being questioned by a "neutral" law enforcement officer. App. 76–77. The prosecution played the tape for the jury and relied on it in closing, arguing that it was "damning evidence" that "completely

refutes [petitioner's] claim of self-defense." Tr. 468 (Oct. 21, 1999). The jury convicted petitioner of assault.

The Washington Court of Appeals reversed. It applied a nine-factor test to determine whether Sylvia's statement bore particularized guarantees of trustworthiness, and noted several reasons why it did not: The statement contradicted one she had previously given; it was made in response to specific questions; and at one point she admitted she had shut her eyes during the stabbing. The court considered and rejected the State's argument that Sylvia's statement was reliable because it coincided with petitioner's to such a degree that the two "interlocked." The court determined that, although the two statements agreed about the events leading up to the stabbing, they differed on the issue crucial to petitioner's self-defense claim: "[Petitioner's] version asserts that Lee may have had something in his hand when he stabbed him; but Sylvia's version has Lee grabbing for something only after he has been stabbed." App. 32.

The Washington Supreme Court reinstated the conviction, unanimously concluding that, although Sylvia's statement did not fall under a firmly rooted hearsay exception, it bore guarantees of trustworthiness: "'[W]hen a codefendant's confession is virtually identical [to, i. e., interlocks with,] that of a defendant, it may be deemed reliable.'" 147 Wash. 2d 424, 437, 54 P. 3d 656, 663 (2002) (quoting State v. Rice, 120 Wash. 2d 549, 570, 844 P. 2d 416, 427 (1993)). The court explained:

> "Although the Court of Appeals concluded that the statements were contradictory, upon closer inspection they appear to overlap. . . .
>
> "[B]oth of the Crawfords' statements indicate that Lee was possibly grabbing for a weapon, but they are equally unsure when this event may have taken place. They are also equally unsure how Michael received the cut on his hand, leading the court to question when, if ever, Lee possessed a weapon. In this respect they overlap. . . .

"[N]either Michael nor Sylvia clearly stated that Lee had a weapon in hand from which Michael was simply defending himself. And it is this omission by both that interlocks the statements and makes Sylvia's statement reliable." 147 Wash. 2d, at 438–439, 54 P. 3d, at 664 (internal quotation marks omitted).[1]

We granted certiorari to determine whether the State's use of Sylvia's statement violated the Confrontation Clause. 539 U. S. 914 (2003).

## II

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." We have held that this bedrock procedural guarantee applies to both federal and state prosecutions. *Pointer* v. *Texas*, 380 U. S. 400, 406 (1965). As noted above, *Roberts* says that an unavailable witness's out-of-court statement may be admitted so long as it has adequate indicia of reliability—*i. e.*, falls within a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." 448 U. S., at 66. Petitioner argues that this test strays from the original meaning of the Confrontation Clause and urges us to reconsider it.

## A

The Constitution's text does not alone resolve this case. One could plausibly read "witnesses against" a defendant to

---

[1] The court rejected the State's argument that guarantees of trustworthiness were unnecessary since petitioner waived his confrontation rights by invoking the marital privilege. It reasoned that "forcing the defendant to choose between the marital privilege and confronting his spouse presents an untenable Hobson's choice." 147 Wash. 2d, at 432, 54 P. 3d, at 660. The State has not challenged this holding here. The State also has not challenged the Court of Appeals' conclusion (not reached by the State Supreme Court) that the confrontation violation, if it occurred, was not harmless. We express no opinion on these matters.

mean those who actually testify at trial, cf. *Woodsides v. State*, 3 Miss. 655, 664–665 (1837), those whose statements are offered at trial, see 3 J. Wigmore, Evidence § 1397, p. 104 (2d ed. 1923) (hereinafter Wigmore), or something in-between, see *infra*, at 52–53. We must therefore turn to the historical background of the Clause to understand its meaning.

The right to confront one's accusers is a concept that dates back to Roman times. See *Coy* v. *Iowa*, 487 U. S. 1012, 1015 (1988); Herrmann & Speer, Facing the Accuser: Ancient and Medieval Precursors of the Confrontation Clause, 34 Va. J. Int'l L. 481 (1994). The founding generation's immediate source of the concept, however, was the common law. English common law has long differed from continental civil law in regard to the manner in which witnesses give testimony in criminal trials. The common-law tradition is one of live testimony in court subject to adversarial testing, while the civil law condones examination in private by judicial officers. See 3 W. Blackstone, Commentaries on the Laws of England 373–374 (1768).

Nonetheless, England at times adopted elements of the civil-law practice. Justices of the peace or other officials examined suspects and witnesses before trial. These examinations were sometimes read in court in lieu of live testimony, a practice that "occasioned frequent demands by the prisoner to have his 'accusers,' *i. e.* the witnesses against him, brought before him face to face." 1 J. Stephen, History of the Criminal Law of England 326 (1883). In some cases, these demands were refused. See 9 W. Holdsworth, History of English Law 216–217, 228 (3d ed. 1944); *e. g., Raleigh's Case*, 2 How. St. Tr. 1, 15–16, 24 (1603); *Throckmorton's Case*, 1 How. St. Tr. 869, 875–876 (1554); cf. *Lilburn's Case*, 3 How. St. Tr. 1315, 1318–1322, 1329 (Star Chamber 1637).

Pretrial examinations became routine under two statutes passed during the reign of Queen Mary in the 16th century, 1 & 2 Phil. & M., c. 13 (1554), and 2 & 3 *id.*, c. 10 (1555).

These Marian bail and committal statutes required justices of the peace to examine suspects and witnesses in felony cases and to certify the results to the court. It is doubtful that the original purpose of the examinations was to produce evidence admissible at trial. See J. Langbein, Prosecuting Crime in the Renaissance 21–34 (1974). Whatever the original purpose, however, they came to be used as evidence in some cases, see 2 M. Hale, Pleas of the Crown 284 (1736), resulting in an adoption of continental procedure. See 4 Holdsworth, *supra*, at 528–530.

The most notorious instances of civil-law examination occurred in the great political trials of the 16th and 17th centuries. One such was the 1603 trial of Sir Walter Raleigh for treason. Lord Cobham, Raleigh's alleged accomplice, had implicated him in an examination before the Privy Council and in a letter. At Raleigh's trial, these were read to the jury. Raleigh argued that Cobham had lied to save himself: "Cobham is absolutely in the King's mercy; to excuse me cannot avail him; by accusing me he may hope for favour." 1 D. Jardine, Criminal Trials 435 (1832). Suspecting that Cobham would recant, Raleigh demanded that the judges call him to appear, arguing that "[t]he Proof of the Common Law is by witness and jury: let Cobham be here, let him speak it. Call my accuser before my face . . . ." 2 How. St. Tr., at 15–16. The judges refused, *id.*, at 24, and, despite Raleigh's protestations that he was being tried "by the Spanish Inquisition," *id.*, at 15, the jury convicted, and Raleigh was sentenced to death.

One of Raleigh's trial judges later lamented that " 'the justice of England has never been so degraded and injured as by the condemnation of Sir Walter Raleigh.' " 1 Jardine, *supra*, at 520. Through a series of statutory and judicial reforms, English law developed a right of confrontation that limited these abuses. For example, treason statutes required witnesses to confront the accused "face to face" at his arraignment. *E. g.*, 13 Car. 2, c. 1, § 5 (1661); see 1 Hale,

*supra*, at 306. Courts, meanwhile, developed relatively strict rules of unavailability, admitting examinations only if the witness was demonstrably unable to testify in person. See *Lord Morley's Case*, 6 How. St. Tr. 769, 770–771 (H. L. 1666); 2 Hale, *supra*, at 284; 1 Stephen, *supra*, at 358. Several authorities also stated that a suspect's confession could be admitted only against himself, and not against others he implicated. See 2 W. Hawkins, Pleas of the Crown, ch. 46, § 3, pp. 603–604 (T. Leach 6th ed. 1787); 1 Hale, *supra*, at 585, n. *(k)*; 1 G. Gilbert, Evidence 216 (C. Lofft ed. 1791); cf. *Tong's Case*, Kel. J. 17, 18, 84 Eng. Rep. 1061, 1062 (1662) (treason). But see *King* v. *Westbeer*, 1 Leach 12, 168 Eng. Rep. 108, 109 (1739).

One recurring question was whether the admissibility of an unavailable witness's pretrial examination depended on whether the defendant had had an opportunity to cross-examine him. In 1696, the Court of King's Bench answered this question in the affirmative, in the widely reported misdemeanor libel case of *King* v. *Paine*, 5 Mod. 163, 87 Eng. Rep. 584. The court ruled that, even though a witness was dead, his examination was not admissible where "the defendant not being present when [it was] taken before the mayor . . . had lost the benefit of a cross-examination." *Id.*, at 165, 87 Eng. Rep., at 585. The question was also debated at length during the infamous proceedings against Sir John Fenwick on a bill of attainder. Fenwick's counsel objected to admitting the examination of a witness who had been spirited away, on the ground that Fenwick had had no opportunity to cross-examine. See *Fenwick's Case*, 13 How. St. Tr. 537, 591–592 (H. C. 1696) (Powys) ("[T]hat which they would offer is something that Mr. Goodman hath sworn when he was examined . . . ; sir J. F. not being present or privy, and no opportunity given to cross-examine the person; and I conceive that cannot be offered as evidence . . ."); *id.*, at 592 (Shower) ("[N]o deposition of a person can be read, though beyond sea, unless in cases where the party it is to be read

against was privy to the examination, and might have cross-examined him . . . . [O]ur constitution is, that the person shall see his accuser"). The examination was nonetheless admitted on a closely divided vote after several of those present opined that the common-law rules of procedure did not apply to parliamentary attainder proceedings—one speaker even admitting that the evidence would normally be inadmissible. See *id.*, at 603–604 (Williamson); *id.*, at 604–605 (Chancellor of the Exchequer); *id.*, at 607; 3 Wigmore § 1364, at 22–23, n. 54. Fenwick was condemned, but the proceedings "must have burned into the general consciousness the vital importance of the rule securing the right of cross-examination." *Id.*, § 1364, at 22; cf. *Carmell* v. *Texas,* 529 U. S. 513, 526–530 (2000).

*Paine* had settled the rule requiring a prior opportunity for cross-examination as a matter of common law, but some doubts remained over whether the Marian statutes prescribed an exception to it in felony cases. The statutes did not identify the circumstances under which examinations were admissible, see 1 & 2 Phil. & M., c. 13 (1554); 2 & 3 *id.*, c. 10 (1555), and some inferred that no prior opportunity for cross-examination was required. See *Westbeer, supra,* at 12, 168 Eng. Rep., at 109; compare *Fenwick's Case,* 13 How. St. Tr., at 596 (Sloane), with *id.*, at 602 (Musgrave). Many who expressed this view acknowledged that it meant the statutes were in derogation of the common law. See *King* v. *Eriswell,* 3 T. R. 707, 710, 100 Eng. Rep. 815, 817 (K. B. 1790) (Grose, J.) (dicta); *id.*, at 722–723, 100 Eng. Rep., at 823–824 (Kenyon, C. J.) (same); compare 1 Gilbert, Evidence, at 215 (admissible only "by Force 'of the Statute'"), with *id.*, at 65. Nevertheless, by 1791 (the year the Sixth Amendment was ratified), courts were applying the cross-examination rule even to examinations by justices of the peace in felony cases. See *King* v. *Dingler,* 2 Leach 561, 562–563, 168 Eng. Rep. 383, 383–384 (1791); *King* v. *Woodcock,* 1 Leach 500, 502–504, 168 Eng. Rep. 352, 353 (1789);

cf. *King* v. *Radbourne*, 1 Leach 457, 459–461, 168 Eng. Rep. 330, 331–332 (1787); 3 Wigmore § 1364, at 23. Early 19th-century treatises confirm that requirement. See 1 T. Starkie, Evidence 95 (1826); 2 *id.*, at 484–492; T. Peake, Evidence 63–64 (3d ed. 1808). When Parliament amended the statutes in 1848 to make the requirement explicit, see 11 & 12 Vict., c. 42, § 17, the change merely "introduced in terms" what was already afforded the defendant "by the equitable construction of the law." *Queen* v. *Beeston*, 29 Eng. L. & Eq. R. 527, 529 (Ct. Crim. App. 1854) (Jervis, C. J.).[2]

## B

Controversial examination practices were also used in the Colonies. Early in the 18th century, for example, the Virginia Council protested against the Governor for having "privately issued several commissions to examine witnesses against particular men *ex parte*," complaining that "the person accused is not admitted to be confronted with, or defend himself against his defamers." A Memorial Concerning the Maladministrations of His Excellency Francis Nicholson, reprinted in 9 English Historical Documents 253, 257 (D. Douglas ed. 1955). A decade before the Revolution, England gave jurisdiction over Stamp Act offenses to the admiralty courts, which followed civil-law rather than common-

---

[2] There is some question whether the requirement of a prior opportunity for cross-examination applied as well to statements taken by a coroner, which were also authorized by the Marian statutes. See 3 Wigmore § 1364, at 23 (requirement "never came to be conceded at all in England"); T. Peake, Evidence 64, n. *(m)* (3d ed. 1808) (not finding the point "expressly decided in any reported case"); *State* v. *Houser*, 26 Mo. 431, 436 (1858) ("there may be a few cases . . . but the authority of such cases is questioned, even in [England], by their ablest writers on common law"); *State* v. *Campbell*, 30 S. C. L. 124, 130 (App. L. 1844) (point "has not . . . been plainly adjudged, even in the English cases"). Whatever the English rule, several early American authorities flatly rejected any special status for coroner statements. See *Houser, supra,* at 436; *Campbell, supra,* at 130; T. Cooley, Constitutional Limitations *318.

law procedures and thus routinely took testimony by deposition or private judicial examination. See 5 Geo. 3, c. 12, §57 (1765); Pollitt, The Right of Confrontation: Its History and Modern Dress, 8 J. Pub. L. 381, 396–397 (1959). Colonial representatives protested that the Act subverted their rights "by extending the jurisdiction of the courts of admiralty beyond its ancient limits." Resolutions of the Stamp Act Congress §8th (Oct. 19, 1765), reprinted in Sources of Our Liberties 270, 271 (R. Perry & J. Cooper eds. 1959). John Adams, defending a merchant in a high-profile admiralty case, argued: "Examinations of witnesses upon Interrogatories, are only by the Civil Law. Interrogatories are unknown at common Law, and Englishmen and common Lawyers have an aversion to them if not an Abhorrence of them." Draft of Argument in *Sewall* v. *Hancock* (Oct. 1768–Mar. 1769), in 2 Legal Papers of John Adams 194, 207 (L. Wroth & H. Zobel eds. 1965).

Many declarations of rights adopted around the time of the Revolution guaranteed a right of confrontation. See Virginia Declaration of Rights §8 (1776); Pennsylvania Declaration of Rights §IX (1776); Delaware Declaration of Rights §14 (1776); Maryland Declaration of Rights §XIX (1776); North Carolina Declaration of Rights §VII (1776); Vermont Declaration of Rights Ch. I, §X (1777); Massachusetts Declaration of Rights §XII (1780); New Hampshire Bill of Rights §XV (1783), all reprinted in 1 B. Schwartz, The Bill of Rights: A Documentary History 235, 265, 278, 282, 287, 323, 342, 377 (1971). The proposed Federal Constitution, however, did not. At the Massachusetts ratifying convention, Abraham Holmes objected to this omission precisely on the ground that it would lead to civil-law practices: "The mode of trial is altogether indetermined; . . . whether [the defendant] is to be allowed to confront the witnesses, and have the advantage of cross-examination, we are not yet told. . . . [W]e shall find Congress possessed of powers enabling them to institute judicatories little less inauspicious than a certain

tribunal in Spain, . . . the *Inquisition.*" 2 Debates on the Federal Constitution 110–111 (J. Elliot 2d ed. 1863). Similarly, a prominent Antifederalist writing under the pseudonym Federal Farmer criticized the use of "written evidence" while objecting to the omission of a vicinage right: "Nothing can be more essential than the cross examining [of] witnesses, and generally before the triers of the facts in question. . . . [W]ritten evidence . . . [is] almost useless; it must be frequently taken ex parte, and but very seldom leads to the proper discovery of truth." R. Lee, Letter IV by the Federal Farmer (Oct. 15, 1787), reprinted in 1 Schwartz, *supra,* at 469, 473. The First Congress responded by including the Confrontation Clause in the proposal that became the Sixth Amendment.

Early state decisions shed light upon the original understanding of the common-law right. *State* v. *Webb,* 2 N. C. 103 (Super. L. & Eq. 1794) *(per curiam),* decided a mere three years after the adoption of the Sixth Amendment, held that depositions could be read against an accused only if they were taken in his presence. Rejecting a broader reading of the English authorities, the court held: "[I]t is a rule of the common law, founded on natural justice, that no man shall be prejudiced by evidence which he had not the liberty to cross examine." *Id.,* at 104.

Similarly, in *State* v. *Campbell,* 30 S. C. L. 124 (App. L. 1844), South Carolina's highest law court excluded a deposition taken by a coroner in the absence of the accused. It held: "[I]f we are to decide the question by the established rules of the common law, there could not be a dissenting voice. For, notwithstanding the death of the witness, and whatever the respectability of the court taking the depositions, the solemnity of the occasion and the weight of the testimony, such depositions are *ex parte,* and, therefore, utterly incompetent." *Id.,* at 125. The court said that one of the "indispensable conditions" implicitly guaranteed by the State Constitution was that "prosecutions be carried on

to the conviction of the accused, by witnesses confronted by him, and subjected to his personal examination." *Ibid.*

Many other decisions are to the same effect. Some early cases went so far as to hold that prior testimony was inadmissible in criminal cases *even if* the accused had a previous opportunity to cross-examine. See *Finn* v. *Commonwealth,* 26 Va. 701, 708 (1827); *State* v. *Atkins,* 1 Tenn. 229 (Super. L. & Eq. 1807) *(per curiam).* Most courts rejected that view, but only after reaffirming that admissibility depended on a prior opportunity for cross-examination. See *United States* v. *Macomb,* 26 F. Cas. 1132, 1133 (No. 15,702) (CC Ill. 1851); *State* v. *Houser,* 26 Mo. 431, 435–436 (1858); *Kendrick* v. *State,* 29 Tenn. 479, 485–488 (1850); *Bostick* v. *State,* 22 Tenn. 344, 345–346 (1842); *Commonwealth* v. *Richards,* 35 Mass. 434, 437 (1837); *State* v. *Hill,* 20 S. C. L. 607, 608–610 (App. 1835); *Johnston* v. *State,* 10 Tenn. 58, 59 (Err. & App. 1821). Nineteenth-century treatises confirm the rule. See 1 J. Bishop, Criminal Procedure § 1093, p. 689 (2d ed. 1872); T. Cooley, Constitutional Limitations *318.

## III

This history supports two inferences about the meaning of the Sixth Amendment.

### A

First, the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused. It was these practices that the Crown deployed in notorious treason cases like Raleigh's; that the Marian statutes invited; that English law's assertion of a right to confrontation was meant to prohibit; and that the founding-era rhetoric decried. The Sixth Amendment must be interpreted with this focus in mind.

Accordingly, we once again reject the view that the Confrontation Clause applies of its own force only to in-court testimony, and that its application to out-of-court statements

introduced at trial depends upon "the law of Evidence for the time being." 3 Wigmore § 1397, at 101; accord, *Dutton v. Evans*, 400 U. S. 74, 94 (1970) (Harlan, J., concurring in result). Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices. Raleigh was, after all, perfectly free to confront those who read Cobham's confession in court.

This focus also suggests that not all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted. On the other hand, *ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them.

The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused—in other words, those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

Various formulations of this core class of "testimonial" statements exist: "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; "extrajudicial statements . . .

contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois,* 502 U. S. 346, 365 (1992) (THOMAS, J., joined by SCALIA, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 3. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing.

Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard. Police interrogations bear a striking resemblance to examinations by justices of the peace in England. The statements are not *sworn* testimony, but the absence of oath was not dispositive. Cobham's examination was unsworn, see 1 Jardine, Criminal Trials, at 430, yet Raleigh's trial has long been thought a paradigmatic confrontation violation, see, *e. g., Campbell,* 30 S. C. L., at 130. Under the Marian statutes, witnesses were typically put on oath, but suspects were not. See 2 Hale, Pleas of the Crown, at 52. Yet Hawkins and others went out of their way to caution that such unsworn confessions were not admissible against anyone but the confessor. See *supra,* at 45.[3]

---

[3] These sources—especially Raleigh's trial—refute THE CHIEF JUSTICE's assertion, *post,* at 71 (opinion concurring in judgment), that the right of confrontation was not particularly concerned with unsworn testimonial statements. But even if, as he claims, a general bar on unsworn hearsay made application of the Confrontation Clause to unsworn testimonial statements a moot point, that would merely change our focus from direct evidence of original meaning of the Sixth Amendment to reasonable inference. We find it implausible that a provision which concededly condemned trial by sworn *ex parte* affidavit thought trial by *unsworn ex*

That interrogators are police officers rather than magistrates does not change the picture either. Justices of the peace conducting examinations under the Marian statutes were not magistrates as we understand that office today, but had an essentially investigative and prosecutorial function. See 1 Stephen, Criminal Law of England, at 221; Langbein, Prosecuting Crime in the Renaissance, at 34–45. England did not have a professional police force until the 19th century, see 1 Stephen, *supra*, at 194–200, so it is not surprising that other government officers performed the investigative functions now associated primarily with the police. The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace.

In sum, even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class.[4]

B

The historical record also supports a second proposition: that the Framers would not have allowed admission of testi-

---

*parte* affidavit perfectly OK. (The claim that unsworn testimony was self-regulating because jurors would disbelieve it, cf. *post*, at 69–70, n. 1, is belied by the very existence of a general bar on unsworn testimony.) Any attempt to determine the application of a constitutional provision to a phenomenon that did not exist at the time of its adoption (here, allegedly, admissible unsworn testimony) involves some degree of estimation—what THE CHIEF JUSTICE calls use of a "proxy," *post*, at 71—but that is hardly a reason not to make the estimation as accurate as possible. Even if, as THE CHIEF JUSTICE mistakenly asserts, there were no direct evidence of how the Sixth Amendment originally applied to unsworn testimony, there is no doubt what its application would have been.

[4] We use the term "interrogation" in its colloquial, rather than any technical legal, sense. Cf. *Rhode Island* v. *Innis*, 446 U. S. 291, 300–301 (1980). Just as various definitions of "testimonial" exist, one can imagine various definitions of "interrogation," and we need not select among them in this case. Sylvia's recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition.

monial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination. The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts. Rather, the "right . . . to be confronted with the witnesses against him," Amdt. 6, is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding. See *Mattox* v. *United States,* 156 U. S. 237, 243 (1895); cf. *Houser,* 26 Mo., at 433–435. As the English authorities above reveal, the common law in 1791 conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations. The numerous early state decisions applying the same test confirm that these principles were received as part of the common law in this country.[5]

---

[5] THE CHIEF JUSTICE claims that English law's treatment of testimonial statements was inconsistent at the time of the framing, *post,* at 72–73, but the examples he cites relate to examinations under the Marian statutes. As we have explained, to the extent Marian examinations were admissible, it was only because the statutes *derogated* from the common law. See *supra,* at 46–47. Moreover, by 1791 even the statutory-derogation view had been rejected with respect to justice-of-the-peace examinations—explicitly in *King* v. *Woodcock,* 1 Leach 500, 502–504, 168 Eng. Rep. 352, 353 (1789), and *King* v. *Dingler,* 2 Leach 561, 562–563, 168 Eng. Rep. 383, 383–384 (1791), and by implication in *King* v. *Radbourne,* 1 Leach 457, 459–461, 168 Eng. Rep. 330, 331–332 (1787).

None of THE CHIEF JUSTICE's citations proves otherwise. *King* v. *Westbeer,* 1 Leach 12, 168 Eng. Rep. 108 (1739), was decided a half century earlier and cannot be taken as an accurate statement of the law in 1791 given the directly contrary holdings of *Woodcock* and *Dingler.* Hale's treatise is older still, and far more ambiguous on this point, see 1 M. Hale, Pleas of the Crown 585–586 (1736); some who espoused the requirement of a prior opportunity for cross-examination thought it entirely consistent with Hale's views. See *Fenwick's Case,* 13 How. St. Tr. 537, 602 (H. C. 1696) (Musgrave). The only timely authority THE CHIEF JUSTICE cites is *King* v. *Eriswell,* 3 T. R. 707, 100 Eng. Rep. 815 (K. B. 1790), but even that decision provides no substantial support. *Eriswell* was not a criminal

We do not read the historical sources to say that a prior opportunity to cross-examine was merely a sufficient, rather than a necessary, condition for admissibility of testimonial statements. They suggest that this requirement was dis-

---

case at all, but a Crown suit against the inhabitants of a town to charge them with care of an insane pauper. *Id.*, at 707–708, 100 Eng. Rep., at 815–816. It is relevant only because the judges discuss the Marian statutes in dicta. One of them, Buller, J., defended admission of the pauper's statement of residence on the basis of authorities that purportedly held *ex parte* Marian examinations admissible. *Id.*, at 713–714, 100 Eng. Rep., at 819. As evidence writers were quick to point out, however, his authorities said no such thing. See Peake, Evidence, at 64, n. *(m)* ("Mr. J. Buller is reported to have said that it was so settled in 1 Lev. 180, and Kel. 55; certainly nothing of the kind appears in those books"); 2 T. Starkie, Evidence 487–488, n. *(c)* (1826) ("Buller, J. . . . refers to *Radbourne*'s case . . . ; but in that case the deposition was taken in the hearing of the prisoner, and of course the question did not arise" (citation omitted)). Two other judges, Grose, J., and Kenyon, C. J., responded to Buller's argument by distinguishing Marian examinations as a statutory exception to the common-law rule, but the context and tenor of their remarks suggest they merely *assumed* the accuracy of Buller's premise without independent consideration, at least with respect to examinations by justices of the peace. See 3 T. R., at 710, 100 Eng. Rep., at 817 (Grose, J.); *id.*, at 722–723, 100 Eng. Rep., at 823–824 (Kenyon, C. J.). In fact, the case reporter specifically notes in a footnote that their assumption was erroneous. See *id.*, at 710, n. *(c)*, 100 Eng. Rep., at 817, n. *(c)*. Notably, Buller's position on pauper examinations was resoundingly rejected only a decade later in *King* v. *Ferry Frystone*, 2 East 54, 55, 102 Eng. Rep. 289 (K. B. 1801) ("The point . . . has been since considered to be so clear against the admissibility of the evidence . . . that it was abandoned by the counsel . . . without argument"), further suggesting that his views on evidence were not mainstream at the time of the framing.

In short, none of THE CHIEF JUSTICE's sources shows that the law in 1791 was unsettled *even as to examinations by justices of the peace under the Marian statutes*. More importantly, however, even if the statutory rule in 1791 were in doubt, the numerous early state-court decisions make abundantly clear that the Sixth Amendment incorporated the *common-law* right of confrontation and not any exceptions the Marian statutes supposedly carved out from it. See *supra*, at 49–50; see also *supra*, at 47, n. 2 (coroner statements). The common-law rule had been settled since *Paine* in 1696. See *King* v. *Paine*, 5 Mod. 163, 165, 87 Eng. Rep. 584, 585 (K. B.).

positive, and not merely one of several ways to establish re-
liability. This is not to deny, as THE CHIEF JUSTICE notes,
that "[t]here were always exceptions to the general rule of
exclusion" of hearsay evidence. *Post,* at 73. Several had
become well established by 1791. See 3 Wigmore § 1397, at
101; Brief for United States as *Amicus Curiae* 13, n. 5. But
there is scant evidence that exceptions were invoked to
admit *testimonial* statements against the accused in a *crimi-
nal* case.[6] Most of the hearsay exceptions covered state-
ments that by their nature were not testimonial—for exam-
ple, business records or statements in furtherance of a
conspiracy. We do not infer from these that the Framers
thought exceptions would apply even to prior testimony.
Cf. *Lilly* v. *Virginia,* 527 U. S. 116, 134 (1999) (plurality opin-
ion) ("[A]ccomplices' confessions that inculpate a criminal
defendant are not within a firmly rooted exception to the
hearsay rule").[7]

---

[6] The one deviation we have found involves dying declarations. The
existence of that exception as a general rule of criminal hearsay law can-
not be disputed. See, *e. g., Mattox* v. *United States,* 156 U. S. 237, 243–244
(1895); *King* v. *Reason,* 16 How. St. Tr. 1, 24–38 (K. B. 1722); 1 D. Jardine,
Criminal Trials 435 (1832); Cooley, Constitutional Limitations, at *318; 1
G. Gilbert, Evidence 211 (C. Lofft ed. 1791); see also F. Heller, The Sixth
Amendment 105 (1951) (asserting that this was the *only* recognized crimi-
nal hearsay exception at common law). Although many dying declara-
tions may not be testimonial, there is authority for admitting even those
that clearly are. See *Woodcock, supra,* at 501–504, 168 Eng. Rep., at 353–
354; *Reason, supra,* at 24–38; *Peake, supra,* at 64; cf. *Radbourne, supra,*
at 460–462, 168 Eng. Rep., at 332–333. We need not decide in this case
whether the Sixth Amendment incorporates an exception for testimo-
nial dying declarations. If this exception must be accepted on historical
grounds, it is *sui generis.*

[7] We cannot agree with THE CHIEF JUSTICE that the fact "[t]hat a state-
ment might be testimonial does nothing to undermine the wisdom of one
of these [hearsay] exceptions." *Post,* at 74. Involvement of government
officers in the production of testimony with an eye toward trial presents
unique potential for prosecutorial abuse—a fact borne out time and again
throughout a history with which the Framers were keenly familiar. This
consideration does not evaporate when testimony happens to fall within

## IV

Our case law has been largely consistent with these two principles. Our leading early decision, for example, involved a deceased witness's prior trial testimony. *Mattox* v. *United States,* 156 U. S. 237 (1895). In allowing the statement to be admitted, we relied on the fact that the defendant had had, at the first trial, an adequate opportunity to confront the witness: "The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination. This, the law says, he shall under no circumstances be deprived of . . . ." *Id.,* at 244.

Our later cases conform to *Mattox*'s holding that prior trial or preliminary hearing testimony is admissible only if the defendant had an adequate opportunity to cross-examine. See *Mancusi* v. *Stubbs,* 408 U. S. 204, 213–216 (1972); *California* v. *Green,* 399 U. S. 149, 165–168 (1970); *Pointer* v. *Texas,* 380 U. S., at 406–408; cf. *Kirby* v. *United States,* 174 U. S. 47, 55–61 (1899). Even where the defendant had such an opportunity, we excluded the testimony where the government had not established unavailability of the witness. See *Barber* v. *Page,* 390 U. S. 719, 722–725 (1968); cf. *Motes* v. *United States,* 178 U. S. 458, 470–471 (1900). We similarly excluded accomplice confessions where the defendant had no opportunity to cross-examine. See *Roberts* v. *Russell,* 392 U. S. 293, 294–295 (1968) *(per curiam); Bruton* v. *United States,* 391 U. S. 123, 126–128 (1968); *Douglas* v. *Alabama,* 380 U. S. 415, 418–420 (1965). In contrast, we considered reliability factors beyond prior opportunity for cross-examination when the hearsay statement at issue was not testimonial. See *Dutton* v. *Evans,* 400 U. S., at 87–89 (plurality opinion).

---

some broad, modern hearsay exception, even if that exception might be justifiable in other circumstances.

58

Even our recent cases, in their outcomes, hew closely to the traditional line. *Ohio* v. *Roberts*, 448 U. S., at 67–70, admitted testimony from a preliminary hearing at which the defendant had examined the witness. *Lilly* v. *Virginia*, *supra*, excluded testimonial statements that the defendant had had no opportunity to test by cross-examination. And *Bourjaily* v. *United States*, 483 U. S. 171, 181–184 (1987), admitted statements made unwittingly to a Federal Bureau of Investigation informant after applying a more general test that did *not* make prior cross-examination an indispensable requirement.[8]

*Lee* v. *Illinois*, 476 U. S. 530 (1986), on which the State relies, is not to the contrary. There, we *rejected* the State's attempt to admit an accomplice confession. The State had argued that the confession was admissible because it "interlocked" with the defendant's. We dealt with the argument by rejecting its premise, holding that "when the discrepancies between the statements are not insignificant, the codefendant's confession may not be admitted." *Id.*, at 545. Respondent argues that "[t]he logical inference of this state-

---

[8] One case arguably in tension with the rule requiring a prior opportunity for cross-examination when the proffered statement is testimonial is *White* v. *Illinois*, 502 U. S. 346 (1992), which involved, *inter alia*, statements of a child victim to an investigating police officer admitted as spontaneous declarations. *Id.*, at 349–351. It is questionable whether testimonial statements would ever have been admissible on that ground in 1791; to the extent the hearsay exception for spontaneous declarations existed at all, it required that the statements be made "immediat[ely] upon the hurt received, and before [the declarant] had time to devise or contrive any thing for her own advantage." *Thompson* v. *Trevanion*, Skin. 402, 90 Eng. Rep. 179 (K. B. 1693). In any case, the only question presented in *White* was whether the Confrontation Clause imposed an unavailability requirement on the types of hearsay at issue. See 502 U. S., at 348–349. The holding did not address the question whether certain of the statements, because they were testimonial, had to be excluded *even if* the witness was unavailable. We "[took] as a given . . . that the testimony properly falls within the relevant hearsay exceptions." *Id.*, at 351, n. 4.

ment is that when the discrepancies between the statements *are* insignificant, then the codefendant's statement *may* be admitted." Brief for Respondent 6. But this is merely a possible inference, not an inevitable one, and we do not draw it here. If *Lee* had meant authoritatively to announce an exception—previously unknown to this Court's jurisprudence—for interlocking confessions, it would not have done so in such an oblique manner. Our only precedent on interlocking confessions had addressed the entirely different question whether a limiting instruction cured prejudice to codefendants from admitting a defendant's *own* confession against him in a joint trial. See *Parker* v. *Randolph*, 442 U. S. 62, 69–76 (1979) (plurality opinion), abrogated by *Cruz* v. *New York*, 481 U. S. 186 (1987).

Our cases have thus remained faithful to the Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.[9]

---

[9] THE CHIEF JUSTICE complains that our prior decisions have "never drawn a distinction" like the one we now draw, citing in particular *Mattox* v. *United States*, 156 U. S. 237 (1895), *Kirby* v. *United States*, 174 U. S. 47 (1899), and *United States* v. *Burr*, 25 F. Cas. 187 (No. 14,694) (CC Va. 1807) (Marshall, C. J.). *Post*, at 71–72. But nothing in these cases contradicts our holding in any way. *Mattox* and *Kirby* allowed or excluded evidence depending on whether the defendant had had an opportunity for cross-examination. *Mattox, supra,* at 242–244; *Kirby, supra,* at 55–61. That the two cases did not extrapolate a more general class of evidence to which that criterion applied does not prevent us from doing so now. As to *Burr*, we disagree with THE CHIEF JUSTICE's reading of the case. Although Chief Justice Marshall made one passing reference to the Confrontation Clause, the case was fundamentally about the hearsay rules governing statements in furtherance of a conspiracy. The "principle so truly important" on which "inroad[s]" had been introduced was the "rule of evidence which rejects mere hearsay testimony." See 25 F. Cas., at 193. Nothing in the opinion concedes exceptions to the Confrontation Clause's exclusion of testimonial statements as we use the term. THE CHIEF JUSTICE fails

60

V

Although the results of our decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales. *Roberts* conditions the admissibility of all hearsay evidence on whether it falls under a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." 448 U. S., at 66. This test departs from the historical principles identified above in two respects. First, it is too broad: It applies the same mode of analysis whether or not the hearsay consists of *ex parte* testimony. This often results in close constitutional scrutiny in cases that are far removed from the core concerns of the Clause. At the same time, however, the test is too narrow: It admits statements that *do* consist of *ex parte* testimony upon a mere finding of reliability. This malleable standard often fails to protect against paradigmatic confrontation violations.

Members of this Court and academics have suggested that we revise our doctrine to reflect more accurately the original understanding of the Clause. See, *e. g., Lilly*, 527 U. S., at 140–143 (BREYER, J., concurring); *White*, 502 U. S., at 366

---

to identify a single case (aside from one minor, arguable exception, see *supra*, at 58, n. 8), where we have admitted testimonial statements based on indicia of reliability other than a prior opportunity for cross-examination. If nothing else, the test we announce is an empirically accurate explanation of the results our cases have reached.

Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. See *California* v. *Green*, 399 U. S. 149, 162 (1970). It is therefore irrelevant that the reliability of some out-of-court statements "'cannot be replicated, even if the declarant testifies to the same matters in court.'" *Post*, at 74 (quoting *United States* v. *Inadi*, 475 U. S. 387, 395 (1986)). The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it. (The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. See *Tennessee* v. *Street*, 471 U. S. 409, 414 (1985).)

(THOMAS, J., joined by SCALIA, J., concurring in part and concurring in judgment); A. Amar, The Constitution and Criminal Procedure 125–131 (1997); Friedman, Confrontation: The Search for Basic Principles, 86 Geo. L. J. 1011 (1998). They offer two proposals: First, that we apply the Confrontation Clause only to testimonial statements, leaving the remainder to regulation by hearsay law—thus eliminating the overbreadth referred to above. Second, that we impose an absolute bar to statements that are testimonial, absent a prior opportunity to cross-examine—thus eliminating the excessive narrowness referred to above.

In *White,* we considered the first proposal and rejected it. 502 U. S., at 352–353. Although our analysis in this case casts doubt on that holding, we need not definitively resolve whether it survives our decision today, because Sylvia Crawford's statement is testimonial under any definition. This case does, however, squarely implicate the second proposal.

## A

Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." Certainly none of the authorities discussed above acknowledges any general reliability exception to the common-law rule. Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined. Cf. 3 Blackstone, Commentaries, at 373 ("This open examination of witnesses . . . is

much more conducive to the clearing up of truth"); M. Hale, History and Analysis of the Common Law of England 258 (1713) (adversarial testing "beats and bolts out the Truth much better").

The *Roberts* test allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability. It thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one. In this respect, it is very different from exceptions to the Confrontation Clause that make no claim to be a surrogate means of assessing reliability. For example, the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability. See *Reynolds* v. *United States*, 98 U. S. 145, 158–159 (1879).

The Raleigh trial itself involved the very sorts of reliability determinations that *Roberts* authorizes. In the face of Raleigh's repeated demands for confrontation, the prosecution responded with many of the arguments a court applying *Roberts* might invoke today: that Cobham's statements were self-inculpatory, 2 How. St. Tr., at 19, that they were not made in the heat of passion, *id.*, at 14, and that they were not "extracted from [him] upon any hopes or promise of Pardon," *id.*, at 29. It is not plausible that the Framers' only objection to the trial was that Raleigh's judges did not properly weigh these factors before sentencing him to death. Rather, the problem was that the judges refused to allow Raleigh to confront Cobham in court, where he could cross-examine him and try to expose his accusation as a lie.

Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes.

## B

The legacy of *Roberts* in other courts vindicates the Framers' wisdom in rejecting a general reliability exception.

The framework is so unpredictable that it fails to provide meaningful protection from even core confrontation violations.

Reliability is an amorphous, if not entirely subjective, concept. There are countless factors bearing on whether a statement is reliable; the nine-factor balancing test applied by the Court of Appeals below is representative. See, e. g., *People* v. *Farrell*, 34 P. 3d 401, 406–407 (Colo. 2001) (eight-factor test). Whether a statement is deemed reliable depends heavily on which factors the judge considers and how much weight he accords each of them. Some courts wind up attaching the same significance to opposite facts. For example, the Colorado Supreme Court held a statement more reliable because its inculpation of the defendant was "detailed," *id.*, at 407, while the Fourth Circuit found a statement more reliable because the portion implicating another was "fleeting," *United States* v. *Photogrammetric Data Servs., Inc.*, 259 F. 3d 229, 245 (2001). The Virginia Court of Appeals found a statement more reliable because the witness was in custody and charged with a crime (thus making the statement more obviously against her penal interest), see *Nowlin* v. *Commonwealth*, 40 Va. App. 327, 335–338, 579 S. E. 2d 367, 371–372 (2003), while the Wisconsin Court of Appeals found a statement more reliable because the witness was *not* in custody and *not* a suspect, see *State* v. *Bintz*, 2002 WI App. 204, ¶ 13, 257 Wis. 2d 177, ¶13, 650 N. W. 2d 913, ¶13. Finally, the Colorado Supreme Court in one case found a statement more reliable because it was given "immediately after" the events at issue, *Farrell*, *supra*, at 407, while that same court, in another case, found a statement more reliable because two years had elapsed, *Stevens* v. *People*, 29 P. 3d 305, 316 (2001).

The unpardonable vice of the *Roberts* test, however, is not its unpredictability, but its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude. Despite the plurality's speculation in *Lilly*, 527 U. S., at 137, that it was "highly unlikely" that

accomplice confessions implicating the accused could survive *Roberts,* courts continue routinely to admit them. See *Photogrammetric Data Servs., supra,* at 245–246; *Farrell, supra,* at 406–408; *Stevens, supra,* at 314–318; *Taylor* v. *Commonwealth,* 63 S. W. 3d 151, 166–168 (Ky. 2001); *State* v. *Hawkins,* No. 2001–P–0060, 2002 WL 31895118, ¶¶ 34–37, *6 (Ohio App., Dec. 31, 2002); *Bintz, supra,* ¶¶ 7–14, 257 Wis. 2d, at 183–188, 650 N. W. 2d, at 916–918; *People* v. *Lawrence,* 55 P. 3d 155, 160–161 (Colo. App. 2001); *State* v. *Jones,* 171 Ore. App. 375, 387–391, 15 P. 3d 616, 623–625 (2000); *State* v. *Marshall,* 136 Ohio App. 3d 742, 747–748, 737 N. E. 2d 1005, 1009 (2000); *People* v. *Schutte,* 240 Mich. App. 713, 718–721, 613 N. W. 2d 370, 376–377 (2000); *People* v. *Thomas,* 313 Ill. App. 3d 998, 1005–1007, 730 N. E. 2d 618, 625–626 (2000); cf. *Nowlin, supra,* at 335–338, 579 S. E. 2d, at 371–372 (witness confessed to a related crime); *People* v. *Campbell,* 309 Ill. App. 3d 423, 431–432, 721 N. E. 2d 1225, 1230 (1999) (same). One recent study found that, after *Lilly,* appellate courts admitted accomplice statements to the authorities in 25 out of 70 cases—more than one-third of the time. Kirst, Appellate Court Answers to the Confrontation Questions in *Lilly* v. *Virginia,* 53 Syracuse L. Rev. 87, 105 (2003). Courts have invoked *Roberts* to admit other sorts of plainly testimonial statements despite the absence of any opportunity to cross-examine. See *United States* v. *Aguilar,* 295 F. 3d 1018, 1021–1023 (CA9 2002) (plea allocution showing existence of a conspiracy); *United States* v. *Centracchio,* 265 F. 3d 518, 527–530 (CA7 2001) (same); *United States* v. *Dolah,* 245 F. 3d 98, 104–105 (CA2 2001) (same); *United States* v. *Petrillo,* 237 F. 3d 119, 122–123 (CA2 2000) (same); *United States* v. *Moskowitz,* 215 F. 3d 265, 268–269 (CA2 2000) *(per curiam)* (same); *United States* v. *Gallego,* 191 F. 3d 156, 166–168 (CA2 1999) (same); *United States* v. *Papajohn,* 212 F. 3d 1112, 1118–1120 (CA8 2000) (grand jury testimony); *United States* v. *Thomas,* 30 Fed. Appx. 277, 279 (CA4 2002) *(per curiam)* (same); *Bintz, supra,* ¶¶ 15–22, 257 Wis. 2d, at 188–

191, 650 N. W. 2d, at 918–920 (prior trial testimony); *State* v. *McNeill*, 140 N. C. App. 450, 457–460, 537 S. E. 2d 518, 523–524 (2000) (same).

To add insult to injury, some of the courts that admit untested testimonial statements find reliability in the very factors that *make* the statements testimonial. As noted earlier, one court relied on the fact that the witness's statement was made to police while in custody on pending charges—the theory being that this made the statement more clearly against penal interest and thus more reliable. *Nowlin, supra,* at 335–338, 579 S. E. 2d, at 371–372. Other courts routinely rely on the fact that a prior statement is given under oath in judicial proceedings. *E. g., Gallego, supra,* at 168 (plea allocution); *Papajohn, supra,* at 1120 (grand jury testimony). That inculpating statements are given in a testimonial setting is not an antidote to the confrontation problem, but rather the trigger that makes the Clause's demands most urgent. It is not enough to point out that most of the usual safeguards of the adversary process attend the statement, when the single safeguard missing is the one the Confrontation Clause demands.

## C

*Roberts'* failings were on full display in the proceedings below. Sylvia Crawford made her statement while in police custody, herself a potential suspect in the case. Indeed, she had been told that whether she would be released "depend[ed] on how the investigation continues." App. 81. In response to often leading questions from police detectives, she implicated her husband in Lee's stabbing and at least arguably undermined his self-defense claim. Despite all this, the trial court admitted her statement, listing several reasons why it was reliable. In its opinion reversing, the Court of Appeals listed several *other* reasons why the statement was *not* reliable. Finally, the State Supreme Court relied exclusively on the interlocking character of the

statement and disregarded every other factor the lower courts had considered. The case is thus a self-contained demonstration of *Roberts'* unpredictable and inconsistent application.

Each of the courts also made assumptions that cross-examination might well have undermined. The trial court, for example, stated that Sylvia Crawford's statement was reliable because she was an eyewitness with direct knowledge of the events. But Sylvia at one point told the police that she had "shut [her] eyes and . . . didn't really watch" part of the fight, and that she was "in shock." App. 134. The trial court also buttressed its reliability finding by claiming that Sylvia was "being questioned by law enforcement, and, thus, the [questioner] is . . . neutral to her and not someone who would be inclined to advance her interests and shade her version of the truth unfavorably toward the defendant." *Id.*, at 77. The Framers would be astounded to learn that *ex parte* testimony could be admitted against a criminal defendant because it was elicited by "neutral" government officers. But even if the court's assessment of the officer's motives was accurate, it says nothing about Sylvia's perception of her situation. Only cross-examination could reveal that.

The State Supreme Court gave dispositive weight to the interlocking nature of the two statements—that they were both ambiguous as to when and whether Lee had a weapon. The court's claim that the two statements were *equally* ambiguous is hard to accept. Petitioner's statement is ambiguous only in the sense that he had lingering doubts about his recollection: "A. I could a swore I seen him goin' for somethin' before, right before everything happened. . . . [B]ut I'm not positive." *Id.*, at 155. Sylvia's statement, on the other hand, is truly inscrutable, since the key timing detail was simply assumed in the leading question she was asked: "Q. Did Kenny do anything to fight back from this assault?" *Id.*, at 137 (punctuation added). Moreover, Sylvia specifi-

cally said Lee had nothing in his hands after he was stabbed, while petitioner was not asked about that.

The prosecutor obviously did not share the court's view that Sylvia's statement was ambiguous—he called it "damning evidence" that "completely refutes [petitioner's] claim of self-defense." Tr. 468 (Oct. 21, 1999). We have no way of knowing whether the jury agreed with the prosecutor or the court. Far from obviating the need for cross-examination, the "interlocking" ambiguity of the two statements made it all the more imperative that they be tested to tease out the truth.

We readily concede that we could resolve this case by simply reweighing the "reliability factors" under *Roberts* and finding that Sylvia Crawford's statement falls short. But we view this as one of those rare cases in which the result below is so improbable that it reveals a fundamental failure on our part to interpret the Constitution in a way that secures its intended constraint on judicial discretion. Moreover, to reverse the Washington Supreme Court's decision after conducting our own reliability analysis would perpetuate, not avoid, what the Sixth Amendment condemns. The Constitution prescribes a procedure for determining the reliability of testimony in criminal trials, and we, no less than the state courts, lack authority to replace it with one of our own devising.

We have no doubt that the courts below were acting in utmost good faith when they found reliability. The Framers, however, would not have been content to indulge this assumption. They knew that judges, like other government officers, could not always be trusted to safeguard the rights of the people; the likes of the dread Lord Jeffreys were not yet too distant a memory. They were loath to leave too much discretion in judicial hands. Cf. U. S. Const., Amdt. 6 (criminal jury trial); Amdt. 7 (civil jury trial); *Ring* v. *Arizona*, 536 U. S. 584, 611–612 (2002) (SCALIA, J., concurring). By replacing categorical constitutional guarantees with

open-ended balancing tests, we do violence to their design. Vague standards are manipulable, and, while that might be a small concern in run-of-the-mill assault prosecutions like this one, the Framers had an eye toward politically charged cases like Raleigh's—great state trials where the impartiality of even those at the highest levels of the judiciary might not be so clear. It is difficult to imagine *Roberts'* providing any meaningful protection in those circumstances.

* * *

Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of "testimonial."[10] Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

In this case, the State admitted Sylvia's testimonial statement against petitioner, despite the fact that he had no opportunity to cross-examine her. That alone is sufficient to make out a violation of the Sixth Amendment. *Roberts* notwithstanding, we decline to mine the record in search of indicia of reliability. Where testimonial statements are at

---

[10] We acknowledge THE CHIEF JUSTICE's objection, *post,* at 75–76, that our refusal to articulate a comprehensive definition in this case will cause interim uncertainty. But it can hardly be any worse than the status quo. See *supra,* at 63–67, and cases cited. The difference is that the *Roberts* test is *inherently,* and therefore *permanently,* unpredictable.

issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.

The judgment of the Washington Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR joins, concurring in the judgment.

I dissent from the Court's decision to overrule *Ohio* v. *Roberts,* 448 U. S. 56 (1980). I believe that the Court's adoption of a new interpretation of the Confrontation Clause is not backed by sufficiently persuasive reasoning to overrule long-established precedent. Its decision casts a mantle of uncertainty over future criminal trials in both federal and state courts, and is by no means necessary to decide the present case.

The Court's distinction between testimonial and nontestimonial statements, contrary to its claim, is no better rooted in history than our current doctrine. Under the common law, although the courts were far from consistent, out-of-court statements made by someone other than the accused and not taken under oath, unlike *ex parte* depositions or affidavits, were generally not considered substantive evidence upon which a conviction could be based.[1] See, *e. g., King* v.

---

[1] Modern scholars have concluded that at the time of the founding the law had yet to fully develop the exclusionary component of the hearsay rule and its attendant exceptions, and thus hearsay was still often heard by the jury. See Gallanis, The Rise of Modern Evidence Law, 84 Iowa L. Rev. 499, 534–535 (1999); Mosteller, Remaking Confrontation Clause and Hearsay Doctrine Under the Challenge of Child Sexual Abuse Prosecutions, 1993 U. Ill. L. Rev. 691, 738–746. In many cases, hearsay alone was generally not considered sufficient to support a conviction; rather, it was used to corroborate sworn witness testimony. See 5 J. Wigmore, Evidence § 1364, pp. 17, 19–20, 19, n. 33 (J. Chadbourn rev. 1974) (hereinafter Wigmore) (noting in the 1600's and early 1700's testimonial and non-

*Brasier*, 1 Leach 199, 200, 168 Eng. Rep. 202 (K. B. 1779); see also J. Langbein, Origins of Adversary Criminal Trial 235–242 (2003); G. Gilbert, Evidence 152 (3d ed. 1769).[2] Testimonial statements such as accusatory statements to police officers likely would have been disapproved of in the 18th century, not necessarily because they resembled *ex parte* affidavits or depositions as the Court reasons, but more likely than not because they were not made under oath.[3] See *King* v. *Woodcock*, 1 Leach 500, 503, 168 Eng. Rep. 352, 353 (1789) (noting that a statement taken by a justice of the peace may not be admitted into evidence unless taken under oath).

---

testimonial hearsay was permissible to corroborate direct testimony); see also J. Langbein, Origins of Adversary Criminal Trial 238–239 (2003). Even when unsworn hearsay was proffered as substantive evidence, however, because of the predominance of the oath in society, juries were largely skeptical of it. See Landsman, Rise of the Contentious Spirit: Adversary Procedure in Eighteenth Century England, 75 Cornell L. Rev. 497, 506 (1990) (describing late 17th-century sentiments); Langbein, Criminal Trial before the Lawyers, 45 U. Chi. L. Rev. 263, 291–293 (1978). In the 18th century, unsworn hearsay was simply held to be of much lesser value than were sworn affidavits or depositions.

[2] Gilbert's noted in 1769:

"Hearsay is no Evidence . . . though a Person Testify what he hath heard upon Oath, yet the Person who spake it was not upon Oath; and if a Man had been in Court and said the same Thing and had not sworn it, he had not been believed in a Court of Justice; for all Credit being derived from Attestation and Evidence, it can rise no higher than the Fountain from whence it flows, and if the first Speech was without Oath, an Oath that there was such a Speech makes it no more than a bare speaking, and so of no Value in a Court of Justice, where all Things were determined under the Solemnities of an Oath . . . ."

[3] Confessions not taken under oath were admissible against a confessor because " 'the most obvious Principles of Justice, Policy, and Humanity' " prohibited an accused from attesting to his statements. 1 G. Gilbert, Evidence 216 (C. Lofft ed. 1791). Still, these unsworn confessions were considered evidence only against the confessor as the Court points out, see *ante*, at 52, and in cases of treason, were insufficient to support even the conviction of the confessor, 2 W. Hawkins, Pleas of the Crown, ch. 46, §4, p. 604, n. 3 (T. Leach 6th ed. 1787).

Without an oath, one usually did not get to the second step of whether confrontation was required.

Thus, while I agree that the Framers were mainly concerned about sworn affidavits and depositions, it does not follow that they were similarly concerned about the Court's broader category of testimonial statements. See 2 N. Webster, An American Dictionary of the English Language (1828) (defining "Testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact. *Such affirmation in judicial proceedings, may be verbal or written, but must be under oath*" (emphasis added)). As far as I can tell, unsworn testimonial statements were treated no differently at common law than were nontestimonial statements, and it seems to me any classification of statements as testimonial beyond that of sworn affidavits and depositions will be somewhat arbitrary, merely a proxy for what the Framers might have intended had such evidence been liberally admitted as substantive evidence like it is today.[4]

I therefore see no reason why the distinction the Court draws is preferable to our precedent. Starting with Chief Justice Marshall's interpretation as a Circuit Justice in 1807, 16 years after the ratification of the Sixth Amendment, *United States* v. *Burr*, 25 F. Cas. 187, 193 (No. 14,694) (CC Va. 1807), continuing with our cases in the late 19th century, *Mattox* v. *United States*, 156 U. S. 237, 243–244 (1895); *Kirby*

---

[4] The fact that the prosecution introduced an unsworn examination in 1603 at Sir Walter Raleigh's trial, as the Court notes, see *ante*, at 52, says little about the Court's distinction between testimonial and nontestimonial statements. Our precedent indicates that unsworn testimonial statements, as do some nontestimonial statements, raise confrontation concerns once admitted into evidence, see, *e. g.*, *Lilly* v. *Virginia*, 527 U. S. 116 (1999); *Lee* v. *Illinois*, 476 U. S. 530 (1986), and I do not contend otherwise. My point is not that the Confrontation Clause does not reach these statements, but rather that it is far from clear that courts in the late 18th century would have treated unsworn statements, even testimonial ones, the same as sworn statements.

v. *United States,* 174 U. S. 47, 54–57 (1899), and through today, *e. g., White* v. *Illinois,* 502 U. S. 346, 352–353 (1992), we have never drawn a distinction between testimonial and nontestimonial statements. And for that matter, neither has any other court of which I am aware. I see little value in trading our precedent for an imprecise approximation at this late date.

I am also not convinced that the Confrontation Clause categorically requires the exclusion of testimonial statements. Although many States had their own Confrontation Clauses, they were of recent vintage and were not interpreted with any regularity before 1791. State cases that recently followed the ratification of the Sixth Amendment were not uniform; the Court itself cites state cases from the early 19th century that took a more stringent view of the right to confrontation than does the Court, prohibiting former testimony even if the witness was subjected to cross-examination. See *ante,* at 50 (citing *Finn* v. *Commonwealth,* 26 Va. 701, 708 (1827); *State* v. *Atkins,* 1 Tenn. 229 (Super. L. & Eq. 1807) *(per curiam)).*

Nor was the English law at the time of the framing entirely consistent in its treatment of testimonial evidence. Generally *ex parte* affidavits and depositions were excluded as the Court notes, but even that proposition was not universal. See *King* v. *Eriswell,* 3 T. R. 707, 100 Eng. Rep. 815 (K. B. 1790) (affirming by an equally divided court the admission of an *ex parte* examination because the declarant was unavailable to testify); *King* v. *Westbeer,* 1 Leach 12, 13, 168 Eng. Rep. 108, 109 (1739) (noting the admission of an *ex parte* affidavit); see also 1 M. Hale, Pleas of the Crown 585–586 (1736) (noting that statements of "accusers and witnesses" which were taken under oath could be admitted into evidence if the declarant was "dead or not able to travel"). Wigmore notes that sworn examinations of witnesses before justices of the peace in certain cases would not have been excluded

until the end of the 1700's, 5 Wigmore § 1364, at 26–27, and sworn statements of witnesses before coroners became excluded only by statute in the 1800's, see *ibid.; id.,* § 1374, at 59. With respect to unsworn testimonial statements, there is no indication that once the hearsay rule was developed courts ever excluded these statements if they otherwise fell within a firmly rooted exception. See, *e. g., Eriswell, supra,* at 715–719 (Buller, J.), 720 (Ashhurst, J.), 100 Eng. Rep., at 819–822 (concluding that an *ex parte* examination was admissible as an exception to the hearsay rule because it was a declaration by a party of his state and condition). Dying declarations are one example. See, *e. g., Woodcock, supra,* at 502–504, 168 Eng. Rep., at 353–354; *King* v. *Reason,* 16 How. St. Tr. 1, 22–23 (K. B. 1722).

Between 1700 and 1800 the rules regarding the admissibility of out-of-court statements were still being developed. See n. 1, *supra.* There were always exceptions to the general rule of exclusion, and it is not clear to me that the Framers categorically wanted to eliminate further ones. It is one thing to trace the right of confrontation back to the Roman Empire; it is quite another to conclude that such a right absolutely excludes a large category of evidence. It is an odd conclusion indeed to think that the Framers created a cut-and-dried rule with respect to the admissibility of testimonial statements when the law during their own time was not fully settled.

To find exceptions to exclusion under the Clause is not to denigrate it as the Court suggests. Chief Justice Marshall stated of the Confrontation Clause: "I know of no principle in the preservation of which all are more concerned. I know none, by undermining which, life, liberty and property, might be more endangered. It is therefore incumbent on courts to be watchful of every inroad on a principle so truly important." *Burr,* 25 F. Cas., at 193. Yet, he recognized that such a right was not absolute, acknowledging that exceptions

to the exclusionary component of the hearsay rule, which he considered as an "inroad" on the right to confrontation, had been introduced. See *ibid.*

Exceptions to confrontation have always been derived from the experience that some out-of-court statements are just as reliable as cross-examined in-court testimony due to the circumstances under which they were made. We have recognized, for example, that co-conspirator statements simply "cannot be replicated, even if the declarant testifies to the same matters in court." *United States* v. *Inadi*, 475 U. S. 387, 395 (1986). Because the statements are made while the declarant and the accused are partners in an illegal enterprise, the statements are unlikely to be false and their admission "actually furthers the 'Confrontation Clause's very mission' which is to 'advance the accuracy of the truth-determining process in criminal trials.'" *Id.*, at 396 (quoting *Tennessee* v. *Street*, 471 U. S. 409, 415 (1985) (some internal quotation marks omitted)). Similar reasons justify the introduction of spontaneous declarations, see *White*, 502 U. S., at 356, statements made in the course of procuring medical services, see *ibid.*, dying declarations, see *Kirby*, *supra*, at 61, and countless other hearsay exceptions. That a statement might be testimonial does nothing to undermine the wisdom of one of these exceptions.

Indeed, cross-examination is a tool used to flesh out the truth, not an empty procedure. See *Kentucky* v. *Stincer*, 482 U. S. 730, 737 (1987) ("The right to cross-examination, protected by the Confrontation Clause, thus is essentially a 'functional' right designed to promote reliability in the truth-finding functions of a criminal trial"); see also *Maryland* v. *Craig*, 497 U. S. 836, 845 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact"). "[I]n a given instance [cross-

examination may] be superfluous; it may be sufficiently clear, in that instance, that the statement offered is free enough from the risk of inaccuracy and untrustworthiness, so that the test of cross-examination would be a work of supererogation." 5 Wigmore § 1420, at 251. In such a case, as we noted over 100 years ago, "The law in its wisdom declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused." *Mattox,* 156 U. S., at 243; see also *Salinger* v. *United States,* 272 U. S. 542, 548 (1926). By creating an immutable category of excluded evidence, the Court adds little to a trial's truth-finding function and ignores this longstanding guidance.

In choosing the path it does, the Court of course overrules *Ohio* v. *Roberts,* 448 U. S. 56 (1980), a case decided nearly a quarter of a century ago. *Stare decisis* is not an inexorable command in the area of constitutional law, see *Payne* v. *Tennessee,* 501 U. S. 808, 828 (1991), but by and large, it "is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process," *id.,* at 827. And in making this appraisal, doubt that the new rule is indeed the "right" one should surely be weighed in the balance. Though there are no vested interests involved, unresolved questions for the future of everyday criminal trials throughout the country surely counsel the same sort of caution. The Court grandly declares that "[w]e leave for another day any effort to spell out a comprehensive definition of 'testimonial,'" *ante,* at 68. But the thousands of federal prosecutors and the tens of thousands of state prosecutors need answers as to what beyond the specific kinds of "testimony" the Court lists, see *ibid.,* is covered by the new rule. They need them now, not months or years from now. Rules of criminal evidence are applied every day in courts through-

out the country, and parties should not be left in the dark in this manner.

To its credit, the Court's analysis of "testimony" excludes at least some hearsay exceptions, such as business records and official records. See *ante*, at 56. To hold otherwise would require numerous additional witnesses without any apparent gain in the truth-seeking process. Likewise to the Court's credit is its implicit recognition that the mistaken application of its new rule by courts which guess wrong as to the scope of the rule is subject to harmless-error analysis. See *ante*, at 42, n. 1.

But these are palliatives to what I believe is a mistaken change of course. It is a change of course not in the least necessary to reverse the judgment of the Supreme Court of Washington in this case. The result the Court reaches follows inexorably from *Roberts* and its progeny without any need for overruling that line of cases. In *Idaho* v. *Wright*, 497 U. S. 805, 820–824 (1990), we held that an out-of-court statement was not admissible simply because the truthfulness of that statement was corroborated by other evidence at trial. As the Court notes, *ante*, at 66, the Supreme Court of Washington gave decisive weight to the "interlocking nature of the two statements." No re-weighing of the "reliability factors," which is hypothesized by the Court, *ante*, at 67, is required to reverse the judgment here. A citation to *Idaho* v. *Wright, supra,* would suffice. For the reasons stated, I believe that this would be a far preferable course for the Court to take here.