ALLEN, J.,
concurring.
I concur in the court’s denial of the motion for certification, and write to expand upon the observations made in my brief original concurring opinion. Readers of the original opinions in this case were likely either perplexed or amused. (I have never before seen or heard of an appellate case with ten separate opinions.) In light of statements contained in some of the opinions, readers also might have suspected that something improper was involved in this court’s decision to consider this case en banc. Implying that the majority of this court knowingly acted outside the requirements of law in voting for en banc consideration of this case, Judge Kahn wrote, “Perhaps to its credit, the majority has not even attempted to set out an adequate jurisdictional statement to support en banc consideration.” And Judge Wolf, joined by Judge Kahn, asserted even more pointedly that the votes in favor of en banc consideration “cannot be justified.” The only substantive response to these accusations was the brief and non-specific concurring opinion that I authored. A precise explanation of my reason for voting in favor of en banc consideration of this case now appears necessary because Judge Kahn has seen fit, through his most recent dissenting opinion, to offer further entreaties to the supreme court for review of this court’s decision to consider this case on an en banc basis, and because Judges Kahn and Wolf have refused to revise their opinions to delete their accusations that this court has knowingly acted in a manner contrary to the requirements of law.
This opinion is not written in an effort to dissuade the supreme court from reviewing this case. Whether the supreme court sees fit to review this case and address the issue of this court’s vote in favor of en banc consideration is obviously the prerogative of that court, and I would not presume to advise the supreme court on how that prerogative should be exercised. But if this issue is to be addressed by the supreme court, I believe the supreme *623 court should be made aware of more than the accusations of Judges Kahn and Wolf and the non-specific response previously provided.
This opinion is also not written because I believe an appellate court or any appellate judge is obligated to articulate reasons for considering a case en banc. Florida Rule of Appellate Procedure 9.331 (the en banc rule) contains no such requirement, and I am aware of no decisional law indicating that this is required. For my part, I have never questioned a judge’s reason for voting for en banc consideration of a case, opting instead to simply accept the vote of a fellow judge as the expression of his or her honest and thoughtful view as to the fitness of a particular case for en banc consideration. I express my reason for voting in favor of en banc consideration in this case because some members of this court do not extend the same deference to me and other members of this court, and because there is at least a possibility that the supreme court will accept review in this case and assume from the accusations of Judges Kahn and Wolf and the absence of a specifically articulated justification for en banc consideration that none exists, and most importantly, because these accusations have the potential of raising a question in the minds of members of the public as to this court’s commitment to the rule of law.
I observed in my original concurring opinion that the restitution issue addressed by the court would amply satisfy the demanding standard of judges who would require an issue of exceptional importance before voting for en banc consideration of a case based upon “exceptional importance.” Contrary to Judge Wolfs accusation, my original opinion contained no “implication that the restitution issue had anything to do with the vote of the court to go en banc.” I do not know why each of the various judges cast their votes as they did on the en banc question. But I do know that the restitution issue had nothing to do with my own vote. Although the restitution issue does seem to me to provide an appropriate basis for en banc consideration, my favorable vote on the en banc motion was not based on the restitution issue. In fact, none of the issues involved in the case had an impact upon my vote.
As I explained in my earlier opinion, I believe there are circumstances in which considerations external to the particular issues presented in the parties briefs will cause a case to be of exceptional importance. I voted in favor of en banc consideration of this case in accordance with my belief that this case involved such circumstances. My vote in favor of en banc consideration was based upon my concern that participation by a particular judge of this court in the panel decision would have led to public perceptions of partiality by this court.
Because public perceptions are involved here, I begin by outlining some background information that has been presented to the general public through the news media. Although numerous news articles have been written regarding the relationship between Mr. Childers and Pensacola attorney Fred Levin, I quote in full only three of these articles in order to provide a flavor for what the public has been told about their relationship. These articles also reference the close personal relationship both Mr. Childers and Mr. Levin enjoyed with Governor Lawton Chiles. (Because I lack personal knowledge as to the matters discussed in the articles, I do not vouch for the accuracy of the information contained therein. Whether completely accurate or not, the significant point here is that these articles reflect what the public has been told.) The first article is from *624 the March 23, 1998, edition of the Miami Herald, the second is from the May 4, 2002, edition of the St. Petersburg Times, and the third is from the June 23, 2002, edition of the St. Petersburg Times.
Chiles Under Fire for Tobacco Deal
TALLAHASSEE — (AP)—Hailed as a hero last summer after winning an $11 billion settlement with the tobacco industry, Gov. Lawton Chiles is now being asked lots of questions about the deal. Nearly every facet of the agreement is now being investigated. The Legislature wants answers, and last week, ABC’s 20/20 dubbed the entire affair as “an old boys scam.”
Chiles and some longtime cronies — former inspector general Harold Lewis, state Sen. W.D. Childers, R-Pensacola, and Pensacola lawyer Fred Levin— slipped past lawmakers the law that made it easier for the state to sue tobacco companies. The governor and his friends then picked the so-called legal dream team. — some of the wealthiest and most established attorneys in the South — to represent the state.
“There must have been something to keep secret for it not to have been done in the open,” said state Sen. Charlie Crist, who chairs the Senate Executive Business, Ethics and Elections Committee.
Chiles rejected an invitation to appear on the ABC program last week.
“The governor has talked about this and talked about this. Almost since the day of the settlement we’ve been talking about this,” said Ryan Banfill, press secretary for Chiles. “He’s talked till he’s been blue in the face on this issue.” Chiles had the disputed amendments to Florida’s Medicaid law, called the Third Party Liability Act, tacked onto a noncontroversial bill that easily passed in the frantic final hours of the 1994 session.
Only later did lawmakers learn that the changes made it easier to win product liability suits against the tobacco industry and possibly other businesses.
Then lawmakers were ignored when Chiles named a group of well-heeled private attorneys, giving them 25 percent in fees of any settlement.
“Why do we have an attorney general for crying out loud?” asks Crist. “We’re already paying for 300, 400 lawyers working under his direction.”
But Chiles chose former law school acquaintance, West Palm Beach trial lawyer Bob Montgomery, to head the legal team.
“Most everybody is excluded unless you’re the buddy of the governor’s,” Crist said. “It’s the good ol’ boy network run amok.”
A Career in Dark, Brought to Light
TALLAHASSEE — (By Steve Bous-quet) — -His official portrait hangs prominently in the Senate chamber with other former Senate presidents, as if he’s still watching over the proceedings below.
W.D. Childers. Dubya Dee. The Banty Rooster. Dean of the Senate.
If not for term limits, he’d still be there, strutting around, cutting deals, generally playing the Capitol for laughs and thumbing his nose at convention. Instead he’s home in Pensacola, freshly fingerprinted and photographed.
Childers was suspended this week from his position as the chairman of the Es-cambia County Commission, charged with five misdemeanor counts of violating the Sunshine Law that prohibits local government officials from discussing public business in private. *625 Five times, the grand jury said, Childers “did unlawfully and knowingly attend a meeting not held in accordance with the provisions of Section 286.011, Florida Statutes, and at said meeting official acts were taken.”
Childers may have a novel defense: his 30 years in the Legislature, where discussions are routinely made in private. The Sunshine Law that Childers is accused of violating does not apply to the Legislature. Only certain types of legislative meetings are required to be public, and different rules apply at different times.
In the Capitol, Childers became an iconic figure, his legend growing larger with each election cycle. He was the redneck politician who chewed tobacco and used cuss words. He once taped a sign to this office door asking for campaign contributions. When he gripped the Senate gavel, the agenda moved at warp speed with no hope of meaningful discussion of public policy.
With open government seemingly under assault from all sides, here’s a thought to ponder: What was so funny about W.D. Childers, anyway?
The man displayed a contempt for open government. He relished putting one over his colleagues, most famously in 1994 when he was at the rostrum and rolled over a generally clueless Legislature to pass the nation’s toughest antito-bacco law.
“All we did was snooker the bastards,” Childers said afterward.
The tobacco liability law was cited as a case of the ends justifying the means. It became the signature issue of Gov. Lawton Chiles’ long career, pumped billions into the budget and made a handful of trial lawyers wealthy. Those lawyers included Fred Levin, who plotted with Childers to pass the 1994 law and now represents his friend on the Sunshine Law charges.
Childers’ roguish behavior generated more humor than outrage in the fantasy world of the Capitol, a place that laughs at the quaint concept of government decisions being made in the light of day and worships, above all, the bottom-line ability to cut deals.
Childers would have been especially proud of the House this week. Speaker Tom Feeney, with Republican and Democratic support, sealed shut a health care bill loaded with special interest provisions. No amendments allowed.
Even ol’ W.D. wouldn’t dare pull anything like that.
After the term limits broom swept him out of the Capitol two years ago, Senator Childers became Escambia County Commissioner Childers. In hindsight, it appears as if he threw all of those bad-government habits in the back of his truck and headed west on Interstate 10, where he continued to behave as he did when he was in the Legislature.
Until this week, when his past caught up with him.
In Trial, Suspended Official Asks Help of Old Ally
PENSACOLA — W.D. Childers has an old friend by his side as the suspended Escambia County commissioner fights charges of violating Florida’s Sunshine Law.
Childers, a former Florida Senate president, and Fred Levin, one of the nation’s most successful civil trial lawyers, have faced some serious jams and experienced success together for more than two decades.
Their friendship figured in a power struggle that resulted in a near fistfight on the Senate floor. Years later, they *626 worked to push through a law that led to Florida’s $13 — billion tobacco settlement. Levin represented Childers in a grand jury investigation. Childers testified on Levin’s behalf when the Florida Bar accused him of illegal gambling.
Now facing the most serious predicament of his political career, Childers again has turned to Levin for help.
The Pensacola Republican goes to trial Monday on charges that he illegally discussed public business in private with other commissioners. He also was indicted last week on two felony counts of bribery and one of money laundering. No trial date has been set on those charges.
After 30 years, term limits forced Child-ers from the Senate. He was elected to the Escambia County Commission in 2000. Gov. Jeb Bush removed him and three other commissioners from office after they were indicted.
Childers, 68, was effusive about Levin in a 1999 interview.
“As an attorney? Best there is,” Child-ers said. “He brings his lunch with him.”
In a recent interview, Levin, 65, was equally enthusiastic in praising Childers. Levin said Childers did not knowingly violate the Sunshine Law, but acknowledged that Childers’ combative style may have contributed to his legal predicament.
“Unfortunately, I think he’s getting a little older,” Levin said. “Like so many of us, you get a little crotchety.”
Former Gov. Reubin Askew was a partner in Levin’s law firm when he was elected governor in 1970. That was the same year Childers, then a Democrat, won Askew’s old Senate seat.
Neither Askew nor Levin saw eye-to-eye with Childers in those days. Levin’s specialty is suing insurance companies on behalf accident victims and Childers then supported restricting such lawsuits. A candidate who unsuccessfully tried to unseat Childers in 1976 received only one outside contribution: Levin’s.
“I can’t even remember the guy’s name,” Levin said, but Childers didn’t forget.
Their relationship took a turn when Lev-in testified against a bill sought by insurers to limit victim lawsuits before Childers’ Senate committee.
Childers, impressed by Levin’s presentation, deserted the insurance industry and voted with the majority to defeat the bill. He then asked the lawyer to his office for a chat.
Levin recalled being relieved as he got up to leave because Childers apparently had forgotten the contribution to his opponent. Just then, Childers asked if Levin thought that candidate could have killed the bill for him.
Their friendship was cemented in 1980 when Levin represented Childers, then designated as the Senate’s next president, during a grand jury investigation. Jurors found that Childers had done nothing wrong in trying to get the state to buy park land from a business associate.
Childers rose to the presidency due largely to his friendship with the late Sen. Dempsey Barron, then the Legislature’s craftiest power broker.
Barron, an insurance company lawyer from Panama City, once disagreed with a bill being considered and went to Childers and Levin, the new Senate president’s $l-a-year legal advisor, to demand that it be killed.
Childers refused.
“There was an explosion,” Levin said. “There was screaming and yelling.”
*627 The bill passed, but Barron forged a coalition of Republicans and Democrats that stripped Childers of power. Other senators had to restrain the former friends when they confronted one another on the Senate floor.
In 1990, Childers vouched for Levin’s integrity at a Florida Bar hearing, but he was unable to prevent the state Supreme Court from reprimanding Levin for gambling.
Four years later, Childers teamed with Levin and Gov. Lawton Chiles to pass a law making it easier for the state to sue tobacco companies to recover the costs of treating sick smokers.
Lawyers on the state’s case, including Levin, made millions. Levin donated $10-million of his share to the University of Florida.
Levin denied that Childers had helped him benefit from the state’s tobacco suit. Levin said Childers had instead persuaded Chiles to remove him from the case, arguing that he had a conflict due to his involvement in passing the law. “I never dreamed that there was ever going to be any benefit to this thing,” Levin said, adding that he thought the suit would be costly, with little chance of success.
Instead, he recruited the lawyers that represented the state.
“Later, I got back in,” he said, “but it had nothing to do with W.D.”
It is possible that some members of the public might believe that Mr. Levin’s good fortune in making millions of dollars on the tobacco litigation — actually “a third of a billion dollars” according to a May 2, 2002, column in the Northwest Florida Daily News — had nothing to do with his personal relationship with Mr. Childers, or with his personal relationship with Governor Chiles, or with the fact that he was allowed to recruit the lawyers who would represent the state in the tobacco litigation. But I doubt that many members of the public would have such beliefs after reading news accounts such as those quoted above. At the very least, after reading those accounts, most members of the public would believe that Mr. Childers and Mr. Levin are extremely close personal and political allies, that they both had a close personal and political relationship with Governor Chiles, that their close relationship with one another and with Governor Chiles ultimately resulted in Mr. Levin’s firm receiving hundreds of millions of dollars from litigation made possible by a law adopted as a result of a legislative “scam” orchestrated by the three of them, that Mr. Levin was Mr. Childers’s long-time personal attorney, and that Mr. Levin was personally representing Mr. Childers on various criminal charges growing out of his actions as an Escambia County commissioner when — and for some period of time after' — the indictment was handed down in the present case.
During his tenure as governor, Lawton Chiles appointed nine judges to this court. The very first of these appointments went to Fred Levin’s 39 year-old law partner, Charles Kahn. It is certainly possible that neither Judge Kahn’s senior law partner, Mr. Levin, nor Mr. Levin’s well-placed friend, Senator Childers, exercised their reputed considerable influence with their friend, Governor Chiles, in seeking Judge Kahn’s appointment to this court. It is even possible that Judge Kahn’s relationship with the governor’s friend, Mr. Levin, had nothing to do with the governor’s decision to appoint Judge Kahn. But a member of the public familiar with the reported relationships between these persons, and also familiar with the realities of the political process, would not be considered unduly cynical to doubt these possibilities.
*628 When Mr. Childers’s appeal from his convictions in this case was assigned to a panel of this court, Judge Kahn was a member of that panel. Oral argument was heard by the panel on November 9, 2004, and it was apparent from Judge Kahn’s persistent questioning of the assistant attorney general assigned to the appeal that Judge Kahn found merit in Mr. Childers’s argument that he had been denied the opportunity to fully develop, through cross-examination, critical state witness Willie Junior’s bias and motive to testify falsely. (A video of the oral argument can be viewed at this court’s website.)
At the time of the oral argument, a reversal on the cross-examination issue would likely have resulted in a new trial for Mr. Childers, but subsequent developments revealed that reversal on the cross-examination issue might result in Mr. Childers not being required to further answer for the crimes for which he had been convicted. News reports contained in the Pensacola News Journal revealed that Willie Junior disappeared on the evening of November 9, 2004, and that his body was found in the crawl space beneath a house in Pensacola a month later, dead from ingestion of a lethal quantity of antifreeze. Mr. Junior’s death seemingly added additional significance to Mr. Childers’s appeal because Mr. Junior would be unavailable to testify in a new trial. In light of the recent decision of the United States Supreme Court in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), it appears unlikely that evidence of Mr. Junior’s former trial testimony would be admissible in a new trial following a holding by this court that the defense had not been afforded an adequate opportunity to cross-examine Mr. Junior. And in light of the importance of Mr. Junior’s testimony to the state’s case, it also appears unlikely that the state would be able to prove its case upon a retrial without this testimony. (Mr. Junior’s death obviously had no impact upon this court’s en banc decision. His death and its likely legal implications are recounted here only to reflect the resulting heightened importance of this court’s decision, from the perspective of Mr. Childers and his friends.)
In June 2005, a divided panel reached its proposed decision in this case. The majority opinion, authored by Judge Kahn, proposed to reverse Mr. Childers’s convictions based upon the argument that Mr. Child-ers had been denied an adequate opportunity to cross-examine Mr. Junior. A dissenting judge disagreed, concluding that the cross-examination issue should be decided in accordance with the reasoning later reflected in the en banc majority opinion. Accordingly, if this panel decision had stood, Mr. Childers’s convictions would have been reversed on a ground making retrial unlikely — thus likely extricating Mr. Childers from what the June 23, 2002, St. Petersburg Times article called “the most serious predicament of his political career.” And the deciding vote on this decision would have been cast by Fred Levin’s former law partner.
Less suspicious members of the public familiar with the information contained in the articles quoted above and also familiar with Judge Kahn’s former association with Mr. Levin and his firm would have found it inappropriate for Judge Kahn to have participated in the case. And more suspicious members of the public would have assumed that Judge Kahn had simply returned past favors provided to him by Mr. Levin and Mr. Childers, thus allowing them, once again, to “snooker the bastards.”
Before the proposed panel decision was filed, another judge of this court moved for *629 en banc consideration of this case. I cast my vote in favor of the motion.
One of my mentors was Circuit Judge Ben Willis, who served for many years as the chief judge of the Second Judicial Circuit. I was honored to have him speak at my investiture as a judge of this court many years ago. Judge Willis’s remarks included a story with a concluding observation. He told the audience that he had himself been invested as a circuit judge on the very day this court came into existence, July 1, 1957, and that after Governor Collins spoke at the investiture of the first judges of this court he then walked over to the Leon County Courthouse to speak at Judge Willis’s investiture. Judge Willis explained that it was especially meaningful to him that his judicial service and that of this court’s first judges had begun on the same day, because he so greatly admired this court. After naming and praising the work and integrity of a number of this court’s former judges he particularly admired, he concluded with this observation: “I don’t know of this court ever having been the subject of a breath of scandal.”
Although Judge Willis’s comments might seem unremarkable to some, they have special meaning for me. I was honored to become a member of a court respected by the public for its integrity, hon- or, and impartiality, and possessed of a record unblemished by public suspicion. This court is still deserving of this reputation. It is comprised of dedicated judges who, from my perspective, work very hard to impartially decide the cases assigned to them in accordance with the requirements of law. But this reputation will not survive if we are oblivious to public perceptions.
The law sometimes requires us to decide cases in ways that displease members of the public. There is nothing that we can do about that. It is an occupational hazard required by the oath we take. But we should never perform our responsibilities in a manner that would cause the public to question the impartiality of our decisions. Yet, I believe that is precisely what Judge Kahn did by failing, on his own motion, to recuse himself from consideration of this case.
If the public’s perception of Judge Kahn’s commitment to impartiality were the only concern here, I might not have voted for en banc consideration of this case. But far more is involved. In light of the composition of the original panel, the proposed panel decision would have been a reflection upon this entire court and would have provoked far more than a mere “breath of scandal.” Because I dearly value the respect this court rightly deserves for the integrity of its judges and for the impartiality of its decisions, I cast my vote for consideration of this case by the full court, not to affect the outcome of the ultimate decision but to see that the ultimate decision of this court is made by judges unblemished by public suspicion. The threat this case presented to the reputation of this court, in my judgment, made it a case of exceptional importance.