COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-09-046-CR

 

 

CURTIS DALE LEWIS                                                            APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

              FROM
THE 271ST DISTRICT COURT OF JACK COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








Appellant
Curtis Dale Lewis was charged by indictment with evading arrest with a vehicle
and, in the companion case, with tampering with evidence.  The two cases were tried together.  The jury could not agree on a verdict in the
evidence tampering case; that case therefore resulted in a mistrial.  But the jury convicted Appellant of evading
arrest with a vehicle and assessed his punishment at fifteen years=
confinement.  The trial court sentenced
him accordingly.  In two points,
Appellant contends that the trial court erred by admitting extraneous offense
evidence during the guilt phase and that the trial court violated the Sixth
Amendment Confrontation Clause by admitting a declarant=s
testimonial statements to law enforcement. 
Because we hold that the trial court did not err, we affirm the trial
court=s
judgment.

Background Facts

At
around 9:00 a.m. on May 27, 2008, informant Debbie Redding called Sergeant
Melissa Wigington of the Jack County Sheriff=s Office
narcotics unit  Aout of
the blue@ to
report that Appellant and William McColpin were at her home and that they all
were on their way to Fort Worth to buy pseudoephedrine to manufacture
methamphetamine.  Redding told Wigington
that she would call as often as she could. 
She called twice when they were buying Sudafed.  During two other calls, they were buying
items such as starter fluid and airline hose. 
At one point, they bought syringes and needles.  Later, Redding called to say that they took
the pills to a place in Jacksboro to be crushed.  Wigington notified other law enforcement
agencies, and they began surveillance as soon as Redding, McColpin, and
Appellant returned to the Joplin area. 
In her final call, Redding told Wigington that they were waiting Aon the
word@ to go
to Young County to cook the methamphetamine.








Surveillance
showed that Redding=s car left her house about 7:10
p.m.  Redding=s car
passed Wigington=s car on Highway 380 West.  Wigington identified Appellant as the driver,
Redding as the front seat passenger, and McColpin as the back seat passenger.  After learning that the suspect vehicle was
heading his way, Deputy Darrell Self watched for it, saw it fail to maintain
its lane by crossing over to the shoulder, activated the overhead emergency
lights of his patrol car, and initiated a traffic stop.  Other units, including Wigington, also
arrived at the scene.

When
Self approached Redding=s stopped car, Appellant drove
off.  The fleeing vehicle pulled over to
the shoulder, and Wigington saw items thrown out the vehicle=s back
door as its brake lights came on.  The
items were a clear plastic bag containing a red and white powder and silver
objects later determined to be lithium batteries.  Self did not see the brake lights, but he saw
the bag of powder thrown out and noticed that the vehicle slowed down every
time something came out of the rear passenger door.








Sergeant
Shane Cartwright, with the Texas DPS Narcotics Service, assisted with the
surveillance and stop.  He tried to box
the suspect vehicle in initially when Self had stopped it.  Cartwright testified that after he made eye
contact with Appellant, Appellant sped off, and Cartwright followed.  The suspect vehicle periodically slowed down
and sped back up and then repeated the process. 
Cartwright noticed the brake lights come on and go off and also noted
that the back right passenger door of the car would repeatedly crack open and
close, and he saw the lithium batteries and a small white object come out of
the car and bounce down the side of the road off into the ditch.

According
to Self, Redding=s car traveled about a mile and
a half from the scene of the original stop. 
Deputy Francis, traveling east on Highway 380, activated his overhead
lights and attempted to stop Redding=s
car.  Appellant drove into a ditch and
around Francis=s car.  Appellant was still driving on the shoulder a
majority of the time, with the back door cracking open and items coming out of
the vehicle.  Appellant finally stopped
about one-quarter mile from where Francis had tried to stop him.








Wigington=s
dashboard camera and the camera of one of the other units  videotaped the action from when Self
initiated the stop until after Appellant and McColpin were arrested and an
inventory search of the car was conducted. 
The police recovered a fanny pack and sacks containing rags, bandanas,
plastic ware,  pitchers, a Gatorade can
with a rag and t-shirt inside it, liquid drain opener, iodized salt, four cans
of starter fluid, eight feet of airline tubing, pliers, an unopened ten-pack,
tic tacs, syringes, and needles.  The
police also recovered Aa considerable amount@ of the
powder thrown from the car as well as the lithium batteries.  The powder was later tested and determined to
be 16.79 grams of a substance that contained pseudoephedrine, a chemical
precursor to methamphetamine.

McColpin,
Appellant=s accomplice, testified that he
went with Appellant and Redding to buy pills and that they bought them in
Springtown, Azle, and Lake Worth.  He
testified that he and Redding entered the stores and made the drug purchases
because Appellant did not have identification, but Appellant bought the starter
fluid and tubing.  McColpin testified
that he thought that they had bought approximately 700 pseudoephedrine
pills.  On the way back to Jacksboro,
McColpin popped the tablets out of their plastic housing and put them in a
bag.  Back in Jacksboro, he took a nap while
Appellant and Redding went to buy the syringes and plastic pitchers.  McColpin then went to a friend=s house
and used her blender to grind up the pills. 
When they later drove away from Redding=s house
together, he thought they were going to go manufacture the methamphetamine.








McColpin
testified that when the police pulled them over, he, Redding, and Appellant
were all Afreaking.@  He hit the back of Appellant=s seat
to Arattle
him out of it@ and said, A[G]o,
you idiot.  We=ve got a
lab in here . . . .@  McColpin testified that he then opened the
back door and threw out the pseudoephedrine; he thought that he poured it all
out.  McColpin stated that Appellant told
him to throw out the batteries and that he was not stopping until McColpin
threw them all out; McColpin threw the batteries out.

Redding
testified that Appellant had been at her house for three days and that he
planned to cook some methamphetamine. 
She said they picked up McColpin, whom she had never met, in
Jacksboro.  Unlike McColpin, she
testified that she, McColpin, and Appellant all went into the stores and bought
pills.  Redding stated that in all, they
bought over 500 or 600 pills.  She
testified that they bought other items for cooking methamphetamine but that she
could not remember everything.  Contrary
to McColpin=s testimony, she testified that
she was Apretty
sure@ that
McColpin purchased the starter fluid and tubing, not Appellant.  Redding also testified that she bought the
needles and syringes.  She confirmed that
they bought plastic ware and plastic pitchers, and she identified the fanny
pack and Gatorade can as Appellant=s.  Redding testified that Appellant and McColpin
planned to meet someone in Graham who had anhydrous ammonia to manufacture the
methamphetamine.  She testified that she
saw both men throw things out of the car after the police tried to stop them
but later stated that she was unsure whether Appellant threw anything out.








Sergeant
Ron Pettigrew with the Texas Department of Public Safety Narcotics Service
testified about two processes used to make methamphetamineCthe
anhydrous method and the red phosphorous method, both of which use
pseudoephedrine.  He testified that the
anhydrous, or ANazi@ method,
is the method used 98% of the time in this area, and he explained how to make
methamphetamine using the anhydrous method. 
He testified that ingredients needed to make methamphetamine include
crushed pills; a solvent, such as ether, starter fluid, or Coleman fuel; the
lithium from a lithium battery; anhydrous ammonia; sulfuric acid, the most
common form of which he stated was drain cleaner; salt; and either a light bulb
or some rags and tape to dry the sludge into a powder.  The State introduced State=s
Exhibit No. 44, a DVD illustrating the anhydrous method, through Pettigrew, who
had provided the DVD to the State because he frequently used it in training law
enforcement.








The
prosecutor showed Pettigrew photographs of evidence found in the vehicle.  He testified that 700 pills should make about
one-and-a-half ounces of methamphetamine; that the starter fluid in this case
would act as the solvent; that the tubing would be used in the sodium chloride
generator; that the pitchers would be used for the ingredients and mixing
thereof; that the Gatorade jug would probably be used to store the anhydrous
ammonia because it was a type of ice cooler; that the pliers would be used in
stripping the lithium  from the
batteries; and that the bandanas would probably be used as filtering
material.  Pettigrew testified that the
only thing missing from the items taken from the scene in order to make
methamphetamine was anhydrous ammonia.

Admission of Testimony of
Pettigrew and DVD Proper

In his
first point, Appellant complains about the admission of extraneous offense
evidence during the guilt phase. 
Specifically, he complains about the testimony of Pettigrew and the DVD
recording showing the process of manufacturing methamphetamine.  Appellant timely objected to the testimony
and the DVD under rules of evidence 401, 403, and 404, and the trial court
overruled his objections.

The
evading arrest indictment provides that Appellant, Aon or
about the 27th day of May, 2008, . . . did then and there, while using a
vehicle, intentionally flee from [Darrell] Self, a person the defendant knew
was a peace officer who was attempting lawfully to arrest or detain the
defendant.@

The
indictment for the offense of tampering with evidence provides that on the same
date, Appellant

did then and there, knowing that an investigation was in progress,
to-wit:  an attempt to stop the vehicle
in which the defendant was an occupant for a traffic offense, intentionally or
knowingly alter, destroy, or conceal a white powder, to-wit: pseudoephedrine,
with intent to impair its availability as evidence in the investigation[.]

 

Paragraph II provides that
Appellant








did then and there, knowing that an offense had been committed,
to-wit: possession or transport of certain chemicals with intent to manufacture
a controlled substance, intentionally or knowingly alter, destroy[,] or conceal
a white powder, to-wit: pseudoephedrine, with intent to impair its availability
as evidence in any subsequent investigation or official proceeding related to
the offense[.]

 

Rule of
evidence 401 provides that A>[r]elevant
evidence= means
evidence having any tendency to make the existence of any fact that is of
consequence to the determination of the action more probable or less probable
than it would be without the evidence.@[2]  The evading arrest count required the State
to prove that the police were trying to lawfully stop Appellant.[3]  The second paragraph of the evidence
tampering charge required the State to prove that Appellant knew that an
offenseCpossession
or transport of certain chemicals with intent to manufacture a controlled
substanceChad occurred when the white
powder was thrown from Redding=s
vehicle.  In either instance, the
evidence describing how methamphetamine is made is relevant:  it tends to show that the stop was lawful for
the evading arrest indictment, and it tends to show that a knowing offense was
being committed for the evidence tampering indictment.  We therefore hold that the trial court did
not abuse its discretion by overruling Appellant=s rule
401 objection.








Further,
because the challenged evidence has relevance apart from character conformity,
we also hold that the trial court did not abuse its discretion by overruling
Appellant=s rule 404 objection.[4]

Rule 403
provides that relevant evidence may nonetheless be excluded Aif its
probative value is substantially outweighed by the danger of unfair prejudice,
confusion of the issues, or misleading the jury, or by considerations of undue
delay, or needless presentation of cumulative evidence.@[5]

As we
have already stated, Pettigrew=s
testimony and the DVD were relevant to the elements of both cases, particularly
the evidence tampering charge.  The
testimony also corroborated accomplice testimony of McColpin and Redding
regarding Appellant=s intent.  Finally, at twenty-six pages, Pettigrew=s
testimony did not unduly delay the trial. 
We note that Appellant raises no argument about the length of the
DVD.  Consequently, we conclude that the
trial court did not abuse its discretion by conducting the balancing test,[6]
overruling Appellant=s rule 403 objection, and
admitting the challenged evidence.  We
overrule Appellant=s first point.








No Violation of Confrontation
Clause When Redding Testified at Trial

In his
second point, Appellant contends that the trial court violated his Sixth
Amendment right to confront witnesses against him by admitting into evidence
the out-of-court statements Redding made to Wigington while the alleged crime
was in progress.  But as the State points
out, there is no violation of the Confrontation Clause when the declarant
appears for cross-examination at trial.[7]  Redding testified and was subject to
cross-examination at trial. 
Consequently, the Confrontation Clause was not implicated by the
admission of her out-of-court statements through Wigington.  We overrule Appellant=s second
point.

Conclusion

Having
overruled both of Appellant=s
points, we affirm the trial court=s
judgment.

 

 

 

LEE ANN DAUPHINOT

JUSTICE

 

PANEL:  LIVINGSTON, C.J.;
DAUPHINOT and GARDNER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  August 31, 2010











[1]See Tex. R. App. P. 47.4.





[2]Tex. R. Evid. 401.





[3]See Tex. Penal Code Ann. ' 38.04(a) (Vernon
Supp. 2009).





[4]See Tex. R. Evid. 404(b).





[5]Tex. R. Evid. 403.





[6]See Casey v. State, 215 S.W.3d 870, 880
(Tex. Crim. App. 2007).





[7]See Crawford v.
Washington,
541 U.S. 36, 59 n.9, 124 S. Ct. 1354, 1369 n.9 (2004).