Rebeca C. Martinez, Justice, dissenting.
While I agree that the Borrowing Parties' claims against Cash Biz in the underlying *355 suit are factually intertwined with the Loan Contracts, and thus fall within the broad scope of the Loan Contracts' arbitration agreement, I disagree with the majority's conclusion that Cash Biz did not "substantially invoke the judicial process" and thus did not waive its right to enforce the arbitration agreement. In my view, the Borrowing Parties met their burden to prove that Cash Biz waived its right to enforce arbitration by showing that Cash Biz filed criminal "bad check" complaints against the Borrowing Parties in an effort to collect restitution on the debts created by the Loan Contracts, thereby substantially invoking the judicial process to obtain a satisfactory result and causing the Borrowing Parties actual prejudice.[1] See Perry Homes v. Cull , 258 S.W.3d 580, 584 (Tex. 2008) (stating the two-prong test for waiver). I therefore dissent to the portion of the majority opinion holding that the Borrowing Parties failed to prove that Cash Biz waived its right to enforce the arbitration agreement by substantially invoking the judicial process.
As the majority notes, the relevant issue presented on appeal is whether Cash Biz's action in filing criminal bad check complaints against the Borrowing Parties was sufficient to constitute substantial invocation of the judicial process, waiving its contractual right to arbitrate the Borrowing Parties' malicious prosecution and other claims against it. The majority concedes that the evidence is undisputed that Cash Biz "provided information and filed criminal complaints against the Borrowing Parties," and that "absent Cash Biz's complaint, no criminal prosecution would have occurred."[2] The majority holds that such evidence is insufficient, however, because it does not show that Cash Biz engaged in "deliberate conduct inconsistent with the right to arbitrate, that is, an active attempt to achieve a satisfactory result through means other than arbitration." See Maj. Op. at p. 352. The majority reasons that Cash Biz's filing of a criminal complaint does not rise to the level of "active engagement in litigation" through "specific and deliberate actions" that are inconsistent with the right to arbitrate, or that reveal an intent to resolve the dispute through litigation rather than arbitration, because: (1) the criminal complaints were filed before the Borrowing Parties filed suit; (2) Cash Biz was not a party to, and did not participate as a witness in, the separate criminal prosecution; and (3) Cash Biz's actions do not show its desire to obtain repayment of the loans through the criminal process. See Maj. Op. at p. 353-54. The majority stresses that, even assuming Cash Biz's action in filing the complaints "initiated" the criminal prosecution, the mere filing of suit or initiation of litigation does not, by itself, constitute substantial invocation of the judicial process.
I disagree with the majority's analysis for several reasons. First, the traditional waiver requirement that the judicial process have been substantially invoked after the filing of the underlying lawsuit is based on the usual situation where there is only one legal proceeding. See , e.g. , Perry Homes , 258 S.W.3d at 585, 591. Here, we are presented with the unique situation of *356 a civil lawsuit and a criminal proceeding, both of which arise out of the same civil debt. Second, while the formal parties in a criminal proceeding are the defendant and the State of Texas, In re Amos , 397 S.W.3d 309, 314 (Tex. App.-Dallas 2013, orig. proceeding), the victim or complainant has a personal interest in the prosecution and thus plays a unique role in criminal proceedings. See In re Ligon , 408 S.W.3d 888, 896 (Tex. App.-Beaumont 2013, orig. proceeding).
Third, I disagree with the majority that Cash Biz's actions in "merely" filing the criminal complaints do not show its desire to obtain repayment of the loans, or otherwise obtain a satisfactory result, through the criminal process. As Flanagan's supplemental affidavit indicates, Cash Biz has staunchly maintained that it acted with no self-interest, but "simply left the information [of potential criminal conduct] to the discretion of the district attorney, and any action taken by the district attorney thereafter was made completely on his/her own." To the contrary, the evidence in this case shows a pattern of specific, deliberate, and affirmative conduct by Cash Biz in filing sworn complaints (accompanied by documentation) with the district attorneys' offices as an immediate and direct reaction to its borrowers' defaults on their payday loans. The 13-page list of criminal cases in the Justice of the Peace Courts for Harris County, Texas, where the bad check cases against the Borrowing Parties were filed, shows that Cash Biz was the complainant in more than 400 bad check cases filed during the relevant time period from May 2011 through July 2012. The appellees represent that Cash Biz repeated this conduct in other Texas counties as well. Given the sheer number and geographic scope of the complaints, it is disingenuous to assert, as Cash Biz does, that it was simply acting as a concerned citizen who was aware of potentially criminal conduct, without any desire for restitution from any of its borrowers. Moreover, at the hearing, counsel for Cash Biz ultimately conceded that Cash Biz would provide the "bad check" information to the prosecutors, and the prosecutors' office would send out letters "to collect."
In addition, in its appellate brief and at oral argument, Cash Biz conceded that it was "mistaken" in believing that it was a crime for its borrowers to give it a post-dated check as security for the loan (as it required). See TEX. PENAL CODE ANN. § 32.41 (West Supp. 2015) (defining the offense of issuance of a bad check). Indeed, the criminal charges against the four named Borrowing Parties were ultimately dismissed. This does not change the fact that they suffered prejudice as a result of the charges, arrests, and defense costs, as well as the mental, emotional, and reputational damages. Other defaulting borrowers against whom Cash Biz filed complaints suffered convictions and punishment, including restitution. Ultimately, Cash Biz invoked the collection authority of the district attorney's office with the expectation to obtain restitution, i.e., repayment of the loans.
While it may be technically correct that the district attorney made the ultimate decision whether to file bad check charges based on the information contained in Cash Biz's sworn complaints, it is also true that no criminal prosecution would ever have been initiated without Cash Biz alerting the district attorney's office and supplying the information stated in, and attached to, its complaints. See Browning-Ferris Indus., Inc. v. Lieck , 881 S.W.2d 288, 293 (Tex. 1994). By submitting the sworn complaints, Cash Biz not only procured the prosecution, it became a "witness" in the criminal prosecution, i.e., a person who presented personal knowledge of the borrowers' purported criminal conduct.
*357 See Crawford v. Washington , 541 U.S. 36, 50-53, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (defining " 'witnesses' against the accused" within the context of the Sixth Amendment to include not only those who actually testify at trial, but also those whose out-of-court statements are used against the defendant). Once the complaint was submitted, the right of confrontation attached to each defendant. Id. at 50, 124 S.Ct. 1354. Whether Cash Biz was attempting to obtain repayment of the loans through restitution as its conduct suggests, or to obtain some other form of punishment against its defaulting borrowers, it deliberately and repeatedly invoked the criminal justice system in an attempt to achieve some form of satisfactory result based on the civil debt. In doing so, Cash Biz ignored its own right and obligation under the arbitration agreement contained in the Loan Contracts to seek collection of the debts through arbitration rather than judicially.
While the instant facts involving Cash Biz's actions in a separate criminal proceeding do not fit within the traditional waiver analysis applied to a single civil lawsuit, the parties have presented us with some cases that are instructive on the application of waiver law to similar fact scenarios. Only one Texas case discusses the interplay between civil and criminal litigation in a waiver-of-arbitration context. In In re Christus Spohn Health Sys. Corp. , 231 S.W.3d 475 (Tex. App.-Corpus Christi-Edinburg 2007, orig. proceeding), a nurse was murdered in her employer hospital's parking lot and her family sued the hospital for wrongful death. Id. at 478. Christus Spohn "substantially litigated" the case during the fourteen-month period before it filed a motion to compel arbitration. Id. at 480-81 (describing how the hospital engaged in "voluminous discovery," filed a motion to designate the criminal defendant as a third party defendant, and filed an original third party petition, while three trial dates were rescheduled). During the fourteen-month period before the hospital sought to compel arbitration, the hospital filed a motion for contempt in the criminal proceeding based on alleged discovery abuse in the civil case by counsel for the deceased's family. Id. at 481. The court of appeals explained that, "[w]hile we ordinarily would not consider actions in a separate cause as indicative of waiver," the motion for contempt expressly stated that Christus Spohn planned to use the criminal court's contempt finding to prevent the use of the criminal defendant's statement in the civil matter. Id. at 481. The court "construe[d] Spohn's actions in this separate lawsuit as part of its strategic plan of defense in the underlying matter that would be inconsistent with a right to arbitrate." Id. (emphasis added). The court of appeals concluded that "Spohn's third-party petition, motion for contempt, and attempt to impose sanctions constitute specific and deliberate actions that are inconsistent with the right to arbitrate and suggest that Spohn was attempting to achieve a satisfactory result through the judicial process." Id. at 481-82. Based on this combination of facts and circumstances, the court held that Christus Spohn had substantially invoked the judicial process and waived its right to enforce arbitration. Id. at 482.
A Nevada court has addressed waiver of arbitration in a factual scenario that is substantially similar, if not identical, to the scenario presented here. The Nevada Supreme Court has held that a payday loan company that obtained default judgments against its borrowers waived its right to arbitration under the loan contracts in a separate lawsuit. Principal Invs., Inc. v. Harrison , ---Nev. ----, 366 P.3d 688, 697-98 (2016). In that case, during a seven-year period, Rapid Cash filed more than *358 16,000 individual collection actions in justice of the peace court in Clark County, Nevada against its borrowers seeking repayment of the loans. Id. at 690. Relying on affidavits of service by its process server, Rapid Cash obtained thousands of default judgments. Id. at 690-91. The borrowers filed a class-action lawsuit against Rapid Cash alleging fraud upon the court through false affidavits of service, abuse of process, negligence, civil conspiracy and violation of fair debt collection laws. Id. at 691. Rapid Cash moved to compel arbitration under the provision contained in the loan agreements, but the trial court denied the motion based on waiver due to the collection actions in justice court. Id. at 691-92. Acknowledging that FAA waiver law requires "prior litigation of the same legal and factual issues as those the party now wants to arbitrate," the Nevada Supreme Court affirmed the finding of waiver, reasoning the class-action claims "arise out of, and are integrally related to, the litigation Rapid Cash conducted in justice court." Id. at 697. The court stated that if the default judgments that Rapid Cash obtained were unenforceable as the product of fraud or criminal misconduct, it would be "unfairly prejudicial to the judgment debtor to require arbitration of claims seeking to set that judgment aside ... and otherwise to remediate its improper entry." Id. at 697-98.
Harrison is not directly on point, but is instructive because there "the named plaintiffs' claims all concern[ed], at their core, the validity of the default judgments," and in our situation the Borrowing Parties' malicious prosecution claims similarly "arise out of, and are integrally related to" the criminal bad check charges instigated by Cash Biz. See id. at 698. Waiver of the right to arbitration under the FAA does not require that the party litigate the identical claims in order to invoke the judicial process, but rather a "specific claim it subsequently wants to arbitrate." Subway Equip. Leasing Corp. v. Forte , 169 F.3d 324, 328 (5th Cir. 1999) (emphasis added). Here, Cash Biz initiated a process that invited the Harris County district attorney to address issues that are at stake in the underlying lawsuit. The Borrowing Parties' malicious prosecution claim contains elements of a plaintiff's innocence.[3] The Borrowing Parties' innocence and the absence of probable cause were litigated in the prior criminal proceedings. Their other claims for fraud and violations of the DTPA and Finance Code similarly involve litigation in the criminal proceedings of defensive issues based on Cash Biz misrepresenting the conditions for the loans the process of collection, and threatening them to achieve repayment. Cash Biz invoked the criminal judicial process to litigate a "specific claim [it] subsequently wants to arbitrate," to wit: the specific issue of non-payment from which all of the Borrowing Parties' causes of action derive.
I believe the record here shows that Cash Biz substantially invoked the judicial process by deliberately engaging in a series of overt acts in court that evidence a desire to resolve the same arbitrable dispute through litigation rather than arbitration. See *359 Tuscan Builders, LP v. 1437 SH6 L.L.C. , 438 S.W.3d 717, 721 (Tex. App.-Houston [1st Dist.] 2014, pet. denied) (op. on reh'g) (quoting Haddock v. Quinn , 287 S.W.3d 158, 177 (Tex. App.-Fort Worth 2009, pet. denied) ). Therefore, I would hold that, by filing the criminal "bad check" complaints against the Borrowing Parties, seeking repayment or some other form of satisfaction, Cash Biz waived its contractual right to arbitrate the malicious prosecution claims arising out of the criminal proceedings.
As to the class-action prohibition, it is not an independent agreement, but is included within the arbitration agreement in the Loan Contracts. Therefore its applicability depends on the applicability of the arbitration agreement. I would therefore hold that the class-action prohibition was similarly waived by Cash Biz's invocation of the judicial process.

Because the majority opinion does not reach the second-prong issue of prejudice, I also omit that analysis; however, I believe the Borrowing Parties proved that they suffered actual prejudice.

The majority agrees that the list of criminal cases in the Harris County Justice of the Peace Court showing Cash Biz as "complainant" in all the cases against the Borrowing Parties, as well as multiple other borrowers, "impliedly reveals" that no criminal prosecution would have been initiated without Cash Biz's complaints.

The elements of a malicious prosecution claim are: (1) the commencement of a criminal prosecution against the plaintiff; (2) causation (initiation or procurement) of the action by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the absence of probable cause for the proceedings; (6) malice in filing the charge; and (7) damage to the plaintiff. Richey v. Brookshire Grocery Co. , 952 S.W.2d 515, 517 (Tex. 1997) ; Davis v. Prosperity Bank , 383 S.W.3d 795, 802 (Tex. App.-Houston [14th Dist.] 2012, no pet.).