FILED

06/07/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0350

DA 19-0350

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 112N

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

JOSEPH MICHAEL CROWELL,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC 15-250B
Honorable Robert B. Allison, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Kathryn Hutchison, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Jonathan M. Krauss, Assistant
Attorney General, Helena, Montana

          Travis R. Ahner, Flathead County Attorney, John Donovan, Deputy County
Attorney, Kalispell, Montana

Submitted on Briefs:  November 17, 2021

Decided:  June 7, 2022

Filed:

_____
Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, we decide this case by memorandum opinion. It shall not be cited and does not serve as precedent. The case title, cause number, and disposition will be included in our quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Joseph Michael Crowell (Crowell) appeals from his 2019 conviction on jury trial in the Montana Eleventh Judicial District Court, Flathead County, on the offense of Aggravated Assault, a felony. We affirm.

¶3 On June 9, 2015, Crowell and his girlfriend, Nicole Amber Smelt (Smelt), were temporarily staying with Smelt's adoptive mother, Linda Ravicher (Ravicher) in Kila, Montana.[1] Smelt's three-year old daughter, A.B., was already living with Ravicher pending adoption under a State child abuse/neglect placement. Ravicher told Smelt earlier that she and Crowell had three days to leave due to limitations on A.B.'s foster placement.[2]

¶4 After work on Monday, June 9, 2015, Ravicher picked up A.B. from daycare and went home. The last thing she remembers was standing in the kitchen before dinner. At 9:10 p.m., a female called the Flathead County 911 Center from Ravicher's home number.[3]

---

[1] Ravicher testified that Smelt was her biological niece whom she raised from three years old after the termination of her mother's parental rights due to drug-related neglect.

[2] Other trial evidence indicates that Crowell and Smelt may also have worn out their welcome based on their smoking and alcohol use in Ravicher's home and increasing tension between Ravicher and Crowell regarding the performance or non-performance of certain house work.

[3] The State presented the 911 recording as evidence at trial.

2

The dispatcher recalled at trial that it was "kind of hard to hear" the caller due to "a lot of screaming" and "heavy breathing." The caller shouted, "come quick" and screamed indecipherably. The 911 recording captured the sound of phone buttons being pressed; the female yelling, "Joe, please, Joe, no, Joe, please, Joe, please, Joe"; and a male uttering something in the background like "come on." The call then terminated at the source.

¶5 Upon arrival, responding sheriff's deputies found A.B. sitting in a highchair on the first floor, apparently watching cartoons. One of them later testified that A.B. was communicative and, in response to his question as to "what happened," said that "Mommy and Joe were in a fight." The deputies saw signs of a struggle upstairs—a broken-in bathroom door jamb with the striker plate on the floor, a broken bedroom bedframe, and a cordless telephone on the floor with the access panel and batteries laying nearby. The State introduced crime scene photographs depicting what the deputies saw upon their arrival at the home.

¶6 A neighbor (Judy), who had worked as an emergency room nurse, testified at trial that, after being summoned to the home of another neighbor, she observed Ravicher in distress, with "red marks on her arm," a "very swollen" blood-covered face, and a "very weak" pulse. She testified that Ravicher appeared to be suffering from head trauma, and was thus confused and unable to describe what had happened. Enroute to the landing area for emergency medical helicopter transport to the hospital, Ravicher complained of a severe headache, pain "all over," and twice vomited. Judy testified that, upon visiting her

in the hospital the next day, Ravicher's face was "still quite swollen" with "very, very dark and purple [bruising] under her eyes." "She definitely had the raccoon eyes."[4]

¶7 A forensic interviewer testified at trial that he conducted a video-recorded interview of A.B. three days after the incident. The State presented the recording at trial. When questioned as to "what happened" with her Grandma, A.B. answered, *inter alia*, that "Mommy kicked her," "someone else [was] with Mommy," and that Grandma got kicked "more than one time." When asked, "[w]ho hit Grandma too," A.B. answered, "um, Mommy." The interviewer responded, "Mommy?" A.B. answered, "[y]eah, and Joe too." When asked, "you said that grandma had a red eye and that she got kicked and hit . . . who did that to her," A.B. answered, "um, Joe."[5] A.B. answered further, *inter alia*, that she saw Grandma "sleeping," saw Mommy say "Grandma, get up," A.B. cried "for Grandma," "waked her up," and that Grandma "then went somewhere else." At trial, defense counsel extensively challenged the interviewer, and made similar arguments to the jury, asserting that various interviewer questions were leading or suggestive in nature.

---

[4] Judy had earlier explained that "raccoon eyes, the blackening of the eyes, is also indicative of a basal cell fracture or a head injury . . . not from being punched in the eye, but [] coming from the inside and showing up as a bruise under the eyes."

[5] A.B. also answered, *inter alia*, that Joe hit Grandma with "a rock," "[h]e was banging in the rock," and affirmed that she "saw Mom and Joe hit . . . Grandma," who "got a red eye." A.B. also made an anomalous reference to a hippopotamus. Beyond speculation, the interviewer could not explain that reference other than to state, "[s]he was changing the topic because she was done talking with me, bored with having an adult conversation about something that she didn't really like talking about." As noted by defense counsel in closing argument, A.B. made the hippopotamus reference incident to talking to the interviewer about the SpongeBob SquarePants cartoon that she was watching when the responding deputies found her alone in the home.

¶8 The next day, Crowell was arrested alone in Ravicher's car in Cowlitz County, Washington, after a high-speed chase following an attempted traffic stop. In the ensuing driving under the influence investigation (DUI), Crowell submitted to a breath test that indicated a 0.275 blood-alcohol content. Shortly after his arrest on various Washington charges, i.e., stolen vehicle possession, eluding police, assault on a peace officer (three counts), malicious mischief, and DUI, Crowell participated in a jailhouse interview conducted by a Cowlitz County sheriff's deputy. In regard to the Kila incident,[6] the deputy testified that he noticed that Crowell had a swollen right hand, which Crowell acknowledged and attributed to a work accident. The deputy stated that Crowell initially gave a different story, but eventually acknowledged having an argument with Ravicher the night before and that he "freaked out" and pushed her with two hands over the kitchen table as she was demanding that he leave and attempting to call 911. He said Crowell told him that Ravicher then fell off the table, hit her head and face hard on the hardwood floor, and that he apparently "knocked her out." Crowell said that he then walked over to her and said, "why do you have to be such a bitch?" Crowell told the deputy that he was aware that police were on the way and that he and Smelt thus left immediately in Ravicher's car.

¶9 On July 13, 2015, the State charged Crowell with aggravated assault, i.e., purposely or knowingly causing serious bodily injury to Ravicher. On July 15, 2015, the District

___

[6] Following Ravicher's assault, the Flathead County Sheriff's Office put out an interstate attempt-to-locate her car. The Washington deputy testified at trial that, prior to interrogating Crowell, he "spoke with one of the deputies" and had received and read the "initial [Flathead County] report."

Court issued an arrest warrant on the Information, but the State did not immediately serve the warrant on Crowell due to his incarceration in Washington.[7] Upon his subsequent discharge of a 33-month prison term on his Washington convictions in March 2018, the State served the previously issued Montana arrest warrant on Crowell and extradited him back to Montana for trial, which then occurred in January 2019.[8] At the close of the State's case-in-chief, Crowell moved for judgment as a matter of law that the State failed to present evidence sufficient to sustain a conviction on the elements of aggravated assault. The District Court denied the motion and Crowell then testified in his defense.

¶10    *Inter alia*, Crowell testified that he was present in the home during the assault and was aware that Ravicher wanted him and Smelt gone from her home. He said that he and A.B. were well acquainted and had a good relationship. He stated that A.B. knew him as "Joe" and did not ever seem confused about who he was. He testified that, after he and Smelt returned home that night, he briefly spoke with A.B. and Ravicher before going outside for a few minutes. He asserted that, when he came back around 9:00, he saw Ravicher laying "facedown" on the floor, Smelt "stomping on the back of her head," and

---

[7] At the time of his arrest on Washington charges, Crowell was also the subject of a $50,000 Montana bench warrant issued on the State's June 2015 petition to revoke his 2009 probation on felony convictions for criminal mischief and criminal endangerment. On discovery of the Montana warrant, a fugitive notice was filed in Washington and the Washington Superior Court issued an Interstate Compact detainer on Crowell, *see similarly* Title 46, ch. 31 (Montana enactment of Interstate Compact on Detainers), with bail set at $50,000 pursuant to the warrant. The record indicates, however, that the Montana probation violation warrant was not actually served on Crowell at that time.

[8] The record indicates that the 2015 Montana probation violation warrant was also served on Crowell at that time.

6

A.B. screaming in her kitchen highchair. He acknowledged that, "[a]s far as I know," A.B. had a "direct line of sight" to where the assault occurred.

¶11 Crowell testified that, after Smelt left the room and went upstairs, he saw Ravicher sit up, and then get up and sit in a chair with a bleeding cut on her head. He stated that he then went upstairs where he saw the "busted" door and Smelt, who was "screaming" in a "bloodcurdling" manner while holding and punching numbers on the telephone. He said he later saw the phone on floor after "the batteries fell out." Crowell testified that he and Smelt returned downstairs where he saw Ravicher still sitting in a chair with "blood . . . running down her face." He said that he and Smelt then drove away in Ravicher's car via a route intended to "to avoid law enforcement." Smelt did not testify at trial.

¶12 Following closing arguments and deliberation, the jury returned a "guilty" verdict. The District Court later imposed a fifty-year prison term, with credit for time served in Montana before sentencing. The court gave him no credit, however, for any time served in Washington following his arrest on Washington charges. Crowell timely appeals.

¶13 Crowell asserts that the District Court erroneously denied his motion for judgment as a matter of law at the close of the State's case-in-chief. He asserts that the State failed to present evidence sufficient to prove beyond a reasonable doubt that *he*, rather than Smelt's alleged stomping on her head, was the cause of serious bodily injury to Ravicher.[9]

---

[9] Defense counsel acknowledged below, and Crowell does not dispute on appeal, that Ravicher suffered serious bodily injury as a result of the subject assault. As instructed here, "serious bodily injury," includes "bodily injury that . . . causes . . . protracted loss or impairment of the function

In support of that assertion, Crowell first asserts that A.B.'s statements to the responding sheriff's deputy and forensic interviewer, identifying Crowell as the perpetrator of the assault, were unreliable child hearsay. He asserts second that his "drunken" post-arrest admissions to the Washington deputy, that he violently pushed Ravicher onto the kitchen table causing her to fall and hit her face and head hard on the hardwood floor, were "too unreliable" to prove that he was the perpetrator of the assault.

¶14 Challenges to the sufficiency of evidence to sustain a criminal conviction are questions of law subject to de novo review. *State v. Colburn*, 2016 MT 246, ¶ 7, 385 Mont. 100, 386 P.3d 561. The standard of review is whether, when viewed in the light most favorable to the conviction, "sufficient record evidence exists upon which the trier of fact could have rationally found all essential elements of the crime proven beyond a reasonable doubt." *City of Bozeman v. McCarthy*, 2019 MT 209, ¶ 12, 397 Mont. 134, 447 P.3d 1048 (internal citations omitted).

¶15 While couched in terms of evidentiary unreliability rather than threshold admissibility, Crowell seemingly asserts, whether expressly or implicitly, that A.B.'s statements were child hearsay admitted in violation of M. R. Evid. 801(c) and 802 (general hearsay rule); § 46-16-220, MCA (otherwise inadmissible hearsay statements of

---

or process of a bodily member or organ," *inter alia.* Section 45-2-101(66)(a)(ii), MCA. The State presented Ravicher's unrebutted testimony that the assault caused her to suffer a permanent traumatic brain injury that resulted in an extended hospital stay, years of ongoing neurologic medical treatment, and permanent memory loss. Her testimony was consistent with Crowell's post-arrest description of the assault to the Washington deputy and the nature of the injury as observed and described by neighbor Judy.

unavailable child witness to violent crime admissible upon specified findings in re circumstantial indicia of trustworthiness/reliability and child ability to communicate and comprehend difference between truth/untruth, *inter alia*); and *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004) (admission of constitutionally "testimonial" evidence of out-of-court statements violates accused's U.S. Const. amend. VI and XIV right to confront adverse witnesses unless declarant unavailable and accused had prior opportunity for cross-examination). As a threshold matter, however, Crowell waived any such hearsay-based objection to the threshold admissibility of A.B.'s statements by failing to contemporaneously object on those grounds. Nor has he made a supported record showing that A.B. was not capable of accurately perceiving and truthfully recalling to the responding deputy and forensic interviewer the pertinent essence of what she purportedly saw under the circumstances of this case. In those regards, Crowell neither asserts, nor has shown that the admission of A.B.'s statement was plain error. Moreover, other State's evidence, i.e., the 911 recording references to "Joe," the male voice in the background, and Crowell's post-arrest admissions, corroborated A.B.'s statements, and thus, their reliability.[10] Under these circumstances, the jury was thus the sole judge of the veracity, credibility, reliability, and relative evidentiary weight of witness statements and testimony presented at trial. Crowell has not shown, as a threshold matter of law, that the pertinent

---

[10] Crowell's subsequent trial testimony further corroborated the reliability of A.B.'s statements based on his acknowledgments that he, A.B., and Smelt were present when Ravicher was assaulted, he and A.B. were well-acquainted and had a good relationship, A.B. called him "Joe," A.B. had a direct line of sight to where Ravicher was being assaulted, and A.B. was screaming as Ravicher was assaulted and lying on the floor.

9

essence of A.B.'s statements identifying him as the perpetrator of Ravicher's assault were inadmissible or otherwise unreliable as proof of the truth of the pertinent matters asserted.

¶16    As to his post-arrest admissions, Crowell asserts, whether expressly or implicitly, that they were the products of police "manipulati[on]." He filed no motion for suppression of those statements, however. He further does not assert, nor has he shown, that the admission of his post-arrest statements was plain error. As with A.B.'s statements, the veracity, credibility, reliability, and relative evidentiary weight of his post-arrest statements were matters for jury assessment and determination under the circumstances of record.

¶17    The State's evidence supporting its assertion that Crowell was the cause of Ravicher's undisputed serious bodily injury included: (1) A.B.'s statements identifying "Joe" as the person who assaulted Ravicher; (2) the undisputed fact that A.B. was present in her kitchen highchair in close proximity to where the assault occurred under the post-arrest version of the assault given by Crowell to the Washington deputy; (3) Crowell's post-arrest admissions to "freak[ing] out"; pushing Ravicher down causing her to hit her head and face hard on the hardwood floor, apparently "knock[ing] her out," (4) the circumstances captured in the 911 recording including the female caller's urgent call for help, indecipherable screaming, exclamatory pleading to "Joe" (i.e., "Joe, please, Joe, no, Joe, please, Joe, please, Joe"), a male uttering something like "come on" in the background, and the sounds of phone buttons being pressed just before the call terminated at its source; and (5) the crime scene circumstances including, *inter alia*, A.B. found alone in the home in her kitchen high chair, the broken master bathroom door jamb, broken bedframe, and

cordless telephone, battery access panel, and batteries laying separately on the bedroom floor. Given the jury's discretion as the sole judge of the veracity, credibility, reliability, and relative weight of the evidence, regardless of conflicting evidence, we hold that, viewed in the light most favorable to the conviction, the State presented minimally sufficient evidence upon which the jury could have rationally found that Crowell assaulted Ravicher, thereby causing her undisputed serious bodily injury.

¶18 Crowell last asserts that the District Court erroneously failed to grant him credit for 116 days of time-served while incarcerated in Washington prior to discharge of his Washington prison term and extradition to Montana. *See* § 46-18-403(1), MCA (entitlement to "credit for each day of incarceration prior to or after conviction" while "incarcerated on a bailable offense against whom a judgment of imprisonment is rendered"). Apart from § 46-18-201(9), MCA (2017),[11] § 46-18-403(1), MCA, required credit for time served in relation to a case other than the subject case only if the other was "directly related" thereto. *State v. Erickson*, 2008 MT 50, ¶ 21, 341 Mont. 426, 177 P.3d 1043. *See also State v. Parks*, 2019 MT 252, ¶ 13, 397 Mont. 408, 450 P.3d 889 ("court must determine for what charge the defendant was being detained"). Here, prior to discharge of his Washington prison term and extradition back to Montana, Crowell served

---

[11] In response to State Response Brief references to new interpretive authority issued after filing of his Opening Brief, Crowell alternatively asserts in his Reply Brief that he is entitled to 1,344 days of credit for time served in Washington pursuant to § 46-18-201(9), MCA (2017); *State v. Mendoza*, 2021 MT 197, 405 Mont. 154, 492 P.3d 509; and *Killam v. Salmonsen*, 2021 MT 196, 405 Mont. 143, 492 P.3d 512. However, § 46-18-201(9), MCA, and in turn *Mendoza* and *Killam*, apply only to crimes "committed after June 30, 2017." 2017 Mont. Laws. ch. 321 § 44.

no time in Washington in direct relation to the arrest warrant issued in this case. He was incarcerated on Washington charges, subject only to an Interstate Compact detainer on an unrelated probation revocation warrant in his wholly-unrelated 2009 Montana case. While he seemingly could have sought credit in his Montana probation revocation case for Washington time served after he was subject to the Montana detainer issued regarding that case,[12] § 46-18-403(1), MCA, did not entitle him to any credit in this case for prior time served in Washington.

¶19 We decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules providing for memorandum opinions. We affirm.

/S/ DIRK M. SANDEFUR

We concur:

/S/ JIM RICE
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ BETH BAKER

---

[12] In the probation revocation case, Crowell received credit upon revocation and resentencing to a Department of Corrections commitment for 243 days of time served in custody after extradition from Washington through "final disposition in [that] matter," as well as additional credit for 454 days "otherwise served on probation" in that case.